Yehudah **WECHSLER**, Plaintiff,

v.

**R D MANAGEMENT CORP.**, Defendant.

No. CV–91–3556.

United States District Court,
E.D. New York.

Aug. 23, 1994.

Yehudah Wechsler, pro se.

Spencer L. Schneider, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

This is a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure by defendant R D Management Corp. ("R D Management") seeking dismissal of the employment discrimination complaint of plaintiff Yehudah Wechsler ("Wechsler"). Wechsler alleges that he was denied employment with the company based on the fact that he is an Orthodox-observant Jew. No opposition papers were submitted, although plaintiff appeared at oral argument. For the following reasons, the motion is granted.

### FACTS

R D Management is a real estate management company specializing in the management of shopping centers and malls throughout the United States and Puerto Rico. *See* Def.'s 3(g) Statement, ¶ 3; Affidavit of Robert P. Murray (R D Management's Office Manager), May 31, 1994 ("Murray Aff'd"), ¶ 3. At the time of the events which gave rise to this action, R D Management managed approximately 110 shopping centers, encompassing approximately 2,700 stores. Murray Aff'd, ¶ 3. Murray also states that R D Management is owned by several families, all of whom are of the Jewish faith; all the owners are active in the Jewish community; Stanley Tanzer, the Comptroller of the company since 1978 is an Orthodox-observant Jew; and the company's in-house accountant since 1990 (now working there on a part-time basis) is also an Orthodox-observant Jew. Murray Aff'd, ¶¶ 7–9.

As noted above, Wechsler is also an Orthodox-observant Jew. Def.'s 3(g) Statement, ¶ 1. In July of 1987 Wechsler responded to an advertisement placed by R D Management in the *New York Times;* R D Management was looking for someone to fill a position in its collection department. According to Murray, "[t]he position required someone with knowledge of the commercial real estate business, the ability to calculate and collect the different types of rents from tenants, to abstract shopping center leases, to use a computer and other assorted duties." Murray Aff'd, ¶ 5 (footnote omitted).

The interview was held on July 22, 1987, with Ms. Nickolette Mitchell ("Mitchell"). Ms. Mitchell testified at her deposition that Wechsler was not called back for another interview because "I assume he was not the best person for the position and that's why he was not called back." Affidavit of Spencer L. Schneider, May 31, 1994 ("Schneider Aff'd"), Ex. B at 125. Mitchell testified that Wechsler was not selected because "he probably wasn't suited for the position." Schneider Aff'd, Ex. B at 125. Mitchell explained:

[H]e didn't seem overly bright—he didn't seem very bright. He was not animated. He didn't seem quick and he didn't seem very interested in terms of asking the questions about the company or asking anything about the position.

His answers to questions were very short, not very in-depth. It was very vague.

As I said, the position needed someone—I don't know if I said it before, but we needed someone who was bright, who could learn quickly, who seemed animated, because everybody in the company was—it was a fast company and you had to be on your own a lot in terms of collections and what to do.

He didn't seem very personable. What's the word? He didn't seem very over-enthusiastic or bright. . . .

Q. [by plaintiff's attorney]¹ Do you remember anything at all that he said?

A. I do recall, and only because this was brought up, because he had to leave early on Fridays and only because two years after I left the company it was told to me, but I don't know.

Schneider Aff'd, Ex. B at 126–28.² Mitchell also testified that at the time of the interview she was aware that "we did, we still do have an employee at R D Management who left early on Fridays and it did not hinder his position." Schneider Aff'd, Ex. B at 170 (referring to Mr. Tanzer).

Sometime after the July 22, 1987 interview, Mitchell interviewed and hired Ms. Romelia Hotchner ("Hotchner") for the collection department. Mitchell testified that she was hired because

I believe she was very smart, very bright in the interview, very—I believe, from my conversations with her, she knew about real estate, commercial real estate. . . .

She was very enthusiastic about the job. She asked a lot of questions about the company. She was genuinely interested in the company and what they do.

She seemed like a take-charge person, a take-charge individual who wouldn't need a lot of prompting and who would not need a lot of supervision, constant supervision.

Schneider Aff'd, Ex. B at 195–96. Hotchner left R D Management after only a few days because, according to Mitchell, "it wasn't re-

ally what she [Hotchner] wanted to do[.]" Schneider Aff'd, Ex. B at 196.

Following Hotchner's departure R D Management ran the advertisement again in the *New York Times* on August 27, 1987. Schneider Aff'd, Ex. H. When Wechsler saw the advertisement he telephoned Mitchell and, "[i]n response to Mr. Wechsler's inquiries about the position, Ms. Mitchell merely stated 'someone else would be better for the job.'" Complaint, ¶ 16. R D Management then interviewed and hired Joel Stahl who "kept the post for a few years, and possessed experience in the commercial real estate business, having worked for 3 years as a collector for two prominent commercial real estate companies[.]" Murray Aff'd, ¶ 6. Mr. Stahl is of the Jewish faith but apparently is not Orthodox-observant. Murray Aff'd, ¶ 6.

As noted above, plaintiff has not submitted any affidavit, Rule 3(g) Statement, or memorandum of law in opposition to defendant's motion for summary judgment. However, plaintiff's position can be gleaned from the complaint and his deposition testimony. In paragraph twelve of the complaint, plaintiff alleges that "[o]nce Mr. Wechsler informed Ms. Mitchell that he was an Orthodox-observant Jew, Ms. Mitchell abruptly brought the interview to a close." Complaint, ¶ 12 (attached as Exhibit A to the Schneider Affidavit).

During his deposition, Wechsler testified that at the point in the interview when he informed Mitchell that he was an observant Orthodox Jew, and therefore would need to leave early on Fridays and be away from the office on Jewish holidays, Mitchell's tone and demeanor changed. Wechsler explained:

Q. You say her tone of voice and expression changed; right, yes or no?

A. Yes.

Q. How did it change?

1. Plaintiff is no longer represented by counsel and is proceeding pro se.

2. Although defendant argues in its memorandum of law that Wechsler was not hired because his past experience was not commensurate with the duties he would have had with R D Management, and because there were misleading statements in his resume, the testimony of Mitchell makes clear that these were not the reasons he was not hired. Rather, as set forth above, Mitchell made the decision not to hire Wechsler because of his demeanor during the interview and her evaluation of his competency.

A. Well, her expression was sort of an expression of disbelief.

Q. What do you mean by "disbelief"?

A. Well, I don't remember exactly now what she did, but disbelief would be to raise the eyebrows or to shake the head back or to maybe twitch a mouth, and her expression at that time showed that she was surprised that I was a candidate for the job and I would not be able to work 9:00 to 5:00 like she explained to me. . . .

Q. What in the tone of her voice changed?

A. Well, tone of voice is something relative you pick up. The way how the person is speaking to you, you feel there is a friendliness that is lost and I felt that.

Q. In what way?

A. Well, I felt she was being very polite until that point and friendly to an extent, keeping a distance, but as soon as I told her that, this friendliness disappeared.

Q. What did it become?

A. Silence.

Q. Silence. So she did not say anything?; did she?

A. Well, for the moment or two that transpired after I told her about my religious observance, she sat there in silence and with an expression of disbelief.

Schneider Aff'd, Ex. D at 311–13.

Wechsler further testified that he believed that he was qualified for the job, Schneider Aff'd, Ex. D at 329, and that

I didn't understand why they did not contact me since I possessed the qualifications for the job, and when I inquired as to why they didn't research the file, Miss Mitchell said to me, "Well, another person would be better for the job" and I asked her, "Could you please elaborate?" And she said "No. Another person would be better for the

job" and the conversation ended right there.

Schneider Aff'd, Ex. D at 330–31.

Plaintiff filed his complaint pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), on or about September 12, 1991, after complying with the statutory prerequisite of filing a complaint with the Equal Opportunity Employment Commission and receiving a right to sue letter on June 20, 1991.[3] Plaintiff alleges that he was denied employment on the basis of his status as an Orthodox-observant Jew in violation of Title VII.

## DISCUSSION

### I. *Wechsler's Failure to Respond to Defendant's Motion*

Before proceeding to the merit's of R D Management's motion for summary judgment, mention needs to be made of the fact that Wechsler has not submitted any papers in opposition to this motion.[4] The Second Circuit recently reversed an order granting summary judgment when the district court failed to inform the pro se plaintiffs that failure to respond to defendant's motion within twenty-one days (pursuant to the court's local rules) would be deemed sufficient cause to grant the motion. *Ruotolo v. Internal Revenue Service*, 28 F.3d 6 (2d Cir. 1994). The Court wrote that

The failure of a district court to apprise pro se litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal. *Sellers v. M.C. Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988) (citing, *inter alia, Maggette v. Dalsheim*, 709 F.2d 800, 802–03 (2d Cir.1983) and *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 767–68 (2d Cir.1983)).

*Id.* at 8.

Explicitly stating that it was reasonable for the district court to assume that the pro se litigants were notified of the court's local

---

**3.** Wechsler also filed a complaint with the New York State Division of Human Rights.

**4.** This motion had already been adjourned once when counsel for defendant learned that he had first sent his motion papers to plaintiff's previous

address. There is no allegation by plaintiff that he failed to receive a copy of the defendant's moving papers and he was in court for oral argument. He did not request an adjournment.

rules and of the consequences of not responding to the motion, the Circuit Court nevertheless reversed the grant of summary judgment. Notwithstanding the validity of those assumptions, the Court held that "[r]ecognizing that the Ruotolos were acting pro se, the district court should have afforded them special solicitude before granting the IRS's motion for summary judgment." *Id.* (citing *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988)).

The implications of the Second Circuit's decision in *Ruotolo* are disquieting. Prompted by it are questions concerning the role of a judge. More specifically, is it ever appropriate for a judge to intervene in the prosecution of a lawsuit, and if it is, when and under what circumstances? Does the Court in *Ruotolo* direct the district court to enlist in the fray on behalf of *all* pro se litigants? Is the district court obliged to afford special solicitude to the pro se litigant who is an attorney? Does the special solicitude the district court must afford the pro se litigant who is a *defendant* extend to notifying him that he should plead the statute of limitations as a defense? Does that special solicitude extend to notifying the pro se litigant that failure to timely respond to a complaint may result in a judgment by default? Does that special solicitude extend to notifying a pro se plaintiff that he has neglected to plead a viable cause of action? If, implicit in the holding of *Ruotolo,* is the assumption that pro se litigants are indigent and unsophisticated, does the solicitude it commands extend to a wealthy and sophisticated pro se litigant? And if the assumption of indigence and ignorance is warranted, is the district court being commanded to be a respecter of persons? *See* Deuteronomy 16:9: "thou shalt not respect persons." It is hardly an unwarranted leap in logic to extend the command of solicitude to a party represented by a less than adequate lawyer who has failed to plead an absolute defense or an incontrovertible cause of action. A fertile imagination is not required to multiply the hypotheticals.

■ Restricting the inquiry to the case in which a litigant appears pro se, I submit that the answer has been provided by the Supreme Court. At the outset, *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), teaches that papers submitted by pro se litigants must be construed liberally in deference to their lack of training in the law. Beyond that, wrote the Court:

> [W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel. As we have noted before, "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of even-handed administration of the law."

*McNeil v. United States,* —— U.S. ——, ——, 113 S.Ct. 1980, 1984, 124 L.Ed.2d 21 (1993) (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)) (footnote omitted) (dismissing a pro se plaintiff's Federal Tort Claims Act complaint filed before submitting the claim to the appropriate agency notwithstanding the harshness of the result). The *Ruotolo* Court either overlooked or failed to acknowledge *McNeil.* The teaching of *McNeil* is the teaching of Deuteronomy—"thou shalt not respect persons." That is, absolute impartiality must be observed whether the litigant is rich or poor.

Based on the reasoning of *McNeil,* this court would not be remiss in granting R D Management's motion for summary judgment based solely on the fact that Wechsler failed to respond to defendant's motion. *See* Local Rule 3(b) ("Failure to comply [with the serving and filing of papers] may be deemed sufficient cause for the denial of the motion or the granting of the motion by default.").[5]

5. The court in *Baldazo v. McCord Travel Management,* No. 92 C 6579, 1993 WL 469911 (N.D.Ill. 1993), reached the same conclusion in holding, pursuant to *McNeil,* that a pro se Title VII plaintiff's failure to submit a rule 3(g) statement is grounds for deeming admitted all facts contained in the moving party's statement of uncontroverted facts, thus forming a basis for granting defendant's motion for summary judgment. Application of the court's holding *Baldazo* to this action would have been particularly appropriate given the fact that Wechsler personally appeared before the court in opposition to a previous motion by defendant for partial summary judgment dismissing plaintiff's claims for compensatory and punitive damages and striking his demand for a trial by jury. Wechsler timely submitted papers in opposition to that previous motion.

However, as the discussion below demonstrates, this court is granting defendant's motion although not simply because Wechsler has failed to comply with Local Rules 3(b) and 3(g); the motion is also being decided on its merits.

## II. *Summary Judgment Standards and Employment Discrimination Actions*

The Second Circuit was recently critical of district courts for granting summary judgment in employment discrimination actions, noting that "[c]onsidering how often we must reverse a grant of summary judgment, the rules for when this provisional remedy may be used apparently need to be repeated." *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994) (reversing grant of summary judgment in age discrimination action where actions by the company—*e.g.*, refusing to interview plaintiff who was well qualified for the position—supported an inference of discrimination).

The Court set out the general criteria for summary judgment in employment discrimination actions:

First, summary judgment may not be granted unless the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. *See Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *DiCola*

*v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 32 (2d Cir.1993). When no rational jury could find in favor of the nonmoving party because the evidence in support of its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988).

Fifth, when deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. A trial court must be cautious about granting summary judgment as to an employer when, as here, its intent is at issue. *See Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir.1989), *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination. Finally, the trial court's task at the summary judgment stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.

*Id.* at 1223–24.

"At least one district court observed that in *Gallo*, the Second Circuit has 'all but outlawed the use of summary judgment' in employment cases, at least where an employer's intent is at issue." *Peele v. New York City Dep't of Social Services/Human Resources Admin.*, No. 92 Civ. 3765, 1994 WL 389160 (S.D.N.Y. July 25, 1994) (quoting *Mclee v. Chrysler*, No. 93 Civ. 3334 (GLG), slip op. at 9–12 (S.D.N.Y. June 24, 1994)). *But see Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir.1994) (affirming grant of summary judgment in age discrimination action where the only evidence supporting an inference of discrimination was deposition testi-

mony of former employee who testified that plaintiffs' former supervisor had been critical of older employees).

The Second Circuit has also stated that "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).[6] *See also Powers v. Dole,* 782 F.2d 689, 694 (7th Cir.1986) ("[E]ven when such issues of motive or intent are at stake, summary judgment is proper 'where the plaintiff presents no indications of motive and intent supportive of his position.'").

III. *Burdens of Proof Pursuant to Title VII*

Wechsler alleges that he was denied employment in July of 1987 in violation of 42 U.S.C. § 2000e–2, which provides as follows:

> (a) It shall be an unlawful employment practice for an employer—
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e–2(a).

■ As the Supreme Court observed in *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), "[t]he objective of Congress in the enactment of Title VII . . . was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." The guidelines for analyzing a case for discrimination in employ-

ment practices were outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093. However, even if a trier of fact rejects the defendant's submission that its reasons were justified, the burden of proving that the employer's motivation was improper remains with the plaintiff. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("[T]he Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff . . . ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'") (emphasis in original).

A. *Wechsler's Prima Facie Case*

■ "In order to establish a *prima facie* case of discriminatory refusal to hire, a plaintiff must prove: (1) that he belongs to a protected minority group; (2) that he applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications he was rejected; and (4) the position remained open and the

---

**6.** This court has not hesitated to grant summary judgment in a employment discrimination action where the evidence did not establish that the employer's motivation was improper. *Johnson v. Tower Air, Inc.,* 149 F.R.D. 461, 466 (E.D.N.Y. 1993) ("While discrimination claims often require a determination of party's intent—normally not a subject for summary judgment—the Second Circuit has recognized that 'the salutary purposes of summary judgment . . . apply no less to discrimination cases than to commercial or other areas of litigation.'") (quoting *Meiri,* 759 F.2d at 998). *See also Edwards v. Interboro Inst.,* 840 F.Supp. 222 (E.D.N.Y.1994) (summary judgment granted for employer on plaintiff's charge of retaliation where plaintiff failed to come forward with any evidence rebutting defendant's legitimate grounds for discharge (insubordination)), *appeal pending,* No. 94–7171.

employer continued to seek applications from persons with the plaintiff's qualifications." *Sandoval v. Saticoy Lemon Ass'n,* 747 F.Supp. 1373, 1390 (C.D.Cal.1990) (citing *McDonnell–Douglas* ). As a general rule, the quantum of proof needed to establish a prima facie case of employment discrimination is de minimis. *Woroski,* 31 F.3d at 108–09. In this case, there is no dispute that plaintiff is a member of a protected minority group (he is Jewish). However, defendant strongly disputes the position adopted by plaintiff in his deposition that he was qualified for the position. R D Management argues that Wechsler's resume "reveals his lack of commercial real estate collections experience, as well as his rather transient employment history." Def.'s Mem. of Law at 17–18. Wechsler's resume does include, however, some experience in the real estate management industry. Schneider Aff'd, Ex. C ("Supervised process of incoming rents and monthly billing. Coordinated daily schedules for repairs to be done by company's contractors.") ("Administrative Real Estate Assistant").[7] Therefore, construing the factual record in favor of the nonmoving party, as the court must, *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir. 1989), and recognizing that establishing a prima facie case of employment discrimination is relatively easy, *Meiri,* 759 F.2d at 996 n. 10, this court finds that Wechsler has established a prima facie case of employment discrimination. It is uncontroverted that after he was rejected, the position remained open and R D Management continued to seek applications from other persons conversant in the ways of the real estate management field.

**B.** *R D Management's Legitimate, Non-discriminatory Reason for Refusing Wechsler Employment*

■ During her deposition, Mitchell explained that she refused to hire Wechsler because of his poor performance during his interview. As noted above at length, Mitchell concluded that Wechsler was not personable and did not have the requisite enthusiasm and energy which she concluded were necessary for the job. She stated that "the position needed someone … who was bright, who could learn quickly, who seemed animated, because … it was a fast company and you had to be on your own a lot in terms of collections and what to do." Schneider Aff'd, Ex. B at 128. The legitimacy of defendant's reason for not hiring Wechsler was highlighted in Mitchell's reasons for hiring Hotchner: "She was very enthusiastic about the job. She asked a lot of questions about the company. She was genuinely interested in the company and what they do. She seemed like a take-charge person.…" Schneider Aff'd, Ex. B at 196.

■ In the context of an allegation of a discriminatory refusal to hire, an unsuccessful performance at a job interview, wherein the applicant fails to convince the prospective employer that he or she is capable of handling the responsibilities of the job, is a legitimate, non-discriminatory reason which adequately rebuts a Title VII plaintiff's prima facie case. *Wright v. Western Elec. Co.,* 664 F.2d 959, 964 (5th Cir.1981) (Court of Appeals affirms judgment for defendant after bench trial where defendant demonstrated that "plaintiff's responses in his two interviews with company personnel indicated a superficial level of knowledge which would be inadequate for the type of unsupervised work required."). Furthermore, even if defendant was incorrect in its assessment of Wechsler's capabilities, and he was in fact as capable as Hotchner, "[t]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. As the Court also observed in *Burdine,* a defendant only has the burden of *articulating* (in the form of admissible evidence), not *proving,* the existence of a legitimate non-discriminatory reason for the employer's action. *Id.* at 254–55, 101 S.Ct. at 1094–95 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons.… If the defendant carries this *burden of production,* the presumption raised by the prima

---

**7.** During oral argument Wechsler argued that he was qualified for the position because his previ-ous employment included commercial properties.

facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.") (emphasis added).

### C. *Lack of Evidence of Pretext*

■ The Second Circuit has explained that,

> At [the point that defendant has articulated a legitimate non-discriminatory reason for plaintiff's termination], the plaintiff must have the opportunity to demonstrate that the employer's proffered reason was not the "true reason" for the employment decision. This may be done either by persuading the trier of fact that a discriminatory reason more likely than not motivated the employer, or by persuading the trier of fact that the employer's proffered explanation is unworthy of belief.

*Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180–81 (2d Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Because this is a motion for summary judgment, the question is whether Wechsler has produced any evidence upon which a reasonable jury could determine that a "discriminatory reason more likely than not motivated [R D Management]" in denying him employment; or that "[R D Management's] proffered explanation [in refusing to hire Wechsler] is unworthy of belief."

■ The only evidence which the court has before it in support of Wechsler's claim of a discriminatory refusal to hire is his statement that Mitchell cut short his interview when she learned that he was an Orthodox-observant Jew, and, that after he called her upon learning of the August advertisement, she refused to tell him why he was not being hired. There is no question that in certain circumstances an abrupt end to an interview could be a fact upon which a jury could infer discriminatory intent, if the basis of the alleged discrimination was not appar-

ent at the start of the interview.[8] However, even if that were the case in this action,[9] and we could say that there is *some* evidence supportive of plaintiff's case, the courts are clear that "some evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the [discriminatory factor] was the real reason for the [employer's actions]." *Woroski*, 31 F.3d at 110.

In fact, in *Woroski*, the Second Circuit affirmed the grant of summary judgment for defendant on plaintiff's age discrimination cause of action even though a former employee testified that the plant manager had stated

> "on many occasions" that the "salary work force[ ] was older, had been around too long, made too much money and enjoyed too many benefits" and that "what this company needed was new younger people, perhaps people out of college ... that were younger, more aggressive, hungrier, that would have come and not had six weeks vacation ... and in fact could be hired for, you know, half or 70% of what these people ... enjoy."

*Id.* at 108. In contrast, all plaintiff can offer is the fact that Mitchell stopped the interview when learning of his status as an Orthodox-observant Jew; an action which is far less damning than a direct statement in an age discrimination action that the company needed "younger people." *See also Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989) (remark by plaintiff's immediate supervisor that he "needed younger blood" is insufficient to create an issue of material fact which would preclude summary judgment in favor of the defendant in age discrimination action); *Meiri*, 759 F.2d at 998 (statement by plaintiff that she "heard

---

8. For example, if an interview was proceeding favorably for the plaintiff and it appeared that the prospective employer was about to offer the plaintiff the job, and then the defendant suddenly realized that the plaintiff was, for example, an Native American, and then terminated the interview with the conclusory statement "We'll get back to you," a reasonable jury might infer that

the defendant had based his decision on impermissible grounds.

9. R D Management does not dispute that the interview with Wechsler ended when Mitchell was told that he was an Orthodox-observant Jew.

disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" is insufficient to send the issue of pretext to a jury).

Although it is not dispositive, it is important to note that R D Management has come forward with evidence that it hires other Orthodox-observant Jews, that Mitchell was aware of this at the time of her interview with Wechsler, and that the company eventually hired a Jew for the position (although he was not Orthodox-observant). Theoretically, one could argue that *because* it already had to accommodate one Orthodox-observant Jew at the time of the interview (Mr. Tanzer), R D Management was interested in seeing that no more such applicants would be accepted. However, plaintiff has not come forward with any evidence to that effect (indeed, he has not even suggested it), and therefore the uncontroverted evidence put forward by defendant (plaintiff's poor performance at his interview) requires that its motion for summary judgment be granted.[10]

Using the criteria outlined by the Court in *Gallo,* the following can be concluded: (i) the deposition testimony of Mitchell and the affidavit testimony of Murray, even construing them in favor of Wechsler, demonstrate that plaintiff was not hired because Mitchell reached the conclusion that he could not handle the job and therefore defendant has carried its burden in establishing that there is no genuine issue as to any material fact vis-a-vis the reasons for defendant's refusal to hire plaintiff; (ii) there is little or no evidence in support of the nonmoving party's case because the only fact offered by plaintiff is that Mitchell stopped the interview upon learning of plaintiff's status as an Orthodox-observant Jew; (iii) no rational jury could find in favor of Wechsler because the evidence in support his case is so slight; (iv) the affidavits and depositions have been carefully scrutinized for circumstantial proof which, if believed, would show discrimination, but, other than Wechsler's subjective belief that the conclusion of the interview was related to his status, none was found; and (v) even though intent is an issue in this action (*i.e.,* defendant's motivation in refusing to hire plaintiff), there is no evidence to suggest that defendant's intent was violative of Title VII. Defendant's motion, therefore, is granted.

### CONCLUSION

For the foregoing reasons, defendant's motion is granted.

SO ORDERED.

---

10. At oral argument, plaintiff noted that at the time of his interview there was only one Orthodox-observant Jew out of a total employee population of approximately forty, and therefore Mr. Tanzer's status as a fellow Orthodox-observant Jew is irrelevant. Wechsler also emphasized that his cause of action is based on his status as an observant Orthodox Jew, and not just as a Jew, and he therefore argued that the fact that the firm is owned by several Jewish families is also irrelevant. The determination to grant summary judgment for R D Management, however, is *not* based on Mr. Tanzer's status or the religion of the families who own the business; rather, it is based on the fact that Wechsler has failed to come forward with any evidence upon which a reasonable jury could conclude that R D Management's refusal to hire was pretextual.