Michael T. REILLY, Plaintiff–Appellee–Cross Appellant,

v.

NATWEST MARKETS GROUP INC., and NatWest Markets, a division of National Westminster Bank, PLC, Defendants–Appellants–Cross Appellees.

Nos. 98–7968, 98–9222.

United States Court of Appeals, Second Circuit.

Argued March 18, 1999.

Decided June 17, 1999.

Richard L. Claman, Stempel Bennet Claman & Hochberg, P.C., New York, New York, for Plaintiff–Appellee–Cross Appellant.

Douglas D. Broadwater, Cravath, Swaine & Moore, New York, New York (Allen K. Rostron of counsel ); Jeffrey L. Liddle, Liddle & Robinson, New York, New York, for Defendants–Appellants–Cross Appellees.

Before: McLAUGHLIN, CALABRESI and GIBSON,* Circuit Judges.

McLAUGHLIN, Circuit Judge:

## BACKGROUND

In January 1994, NatWest, an investment bank, hired Michael T. Reilly to help

---

* The Honorable John R. Gibson, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

develop its fledgling underwriting business. The parties entered into an express contract guaranteeing Reilly's employment for 1994 and 1995 under the following terms. For 1994, Reilly would receive a base salary of $200,000 plus a bonus that would raise his "total compensation" to 33% of the first $4.5 million of gross revenues derived by NatWest from deals on which he worked (the "Percentage Bonus"), but that in no case would be less than $1 million. For 1995, Reilly's salary was to be set by the Percentage Bonus formula, but without the $1 million floor. In both years, Reilly could also receive an extra bonus payable "at NatWest's discretion." Excluding that discretionary bonus, the maximum Reilly could receive each year was $1.485 million, or a total of $2.97 million for both years.

In August 1995, NatWest fired Reilly. Despite his termination, he continued to work as a consultant for the rest of the year. NatWest paid Reilly a total of $1.4 million for 1994 and 1995.

In January 1996, Reilly sued in the United States District Court for the Southern District of New York (Sprizzo, J.) seeking damages for: (1) breach of contract; (2) *quantum meruit*; (3) violation of New York's Labor Law; and (4) defamation. Judge Sprizzo bifurcated the case, the first trial to resolve liability issues and the second to determine damages. He also ordered that "all parties notify all other parties of record five business days prior to serving any third party subpoenas." The case was then assigned to Senior District Judge Samuel J. Conti, visiting from the Northern District of California. Prior to the liability trial, Judge Conti dismissed Reilly's claims for defamation.

In June 1997, the liability trial was held to determine whether NatWest breached Reilly's contract and violated New York's Labor Law. The jury determined that NatWest had: (1) terminated Reilly without cause in breach of his contract; and (2) willfully withheld wages owed to Reilly in violation of New York's Labor Law. NatWest does not appeal those determinations.

Discovery, supervised by Judge Sprizzo, then commenced on damages issues, including *quantum meruit*. Judge Sprizzo ordered the parties to complete all discovery by March 31, 1998. In September 1997, Reilly requested that NatWest produce for deposition those of its representatives who were familiar with the extent and value of the work that he had performed. Reilly made this request pursuant to Fed.R.Civ.P. 30(b)(6), which requires a corporation to respond to a notice for a deposition on a particular subject matter by providing such "persons" as are knowledgeable about the subject matter. NatWest produced only Stephen Sayre, a NatWest investment banker. Although Reilly complained to NatWest that there were a number of "key areas" where Sayre lacked sufficient knowledge to provide complete answers to his inquiries, NatWest did not produce any additional witnesses.

In September 1997, Reilly also requested all documents concerning his activities while at NatWest. In response, NatWest produced some 15 boxes of documents. After reviewing those documents, Reilly notified NatWest that his personal deal files (the "Deal Files") were missing. Reilly claimed that those files were important because they showed his involvement in various transactions that NatWest had never compensated him for. NatWest refused to produce the Deal Files, insisting it did not have them.

In April 1998, Judge Conti reassumed control of the case, and set Monday, May 11th as the trial date. On April 27th, NatWest submitted a witness list naming five witnesses who had not been produced in response to Reilly's Rule 30(b)(6) notice. Among these five were three witnesses, including Joseph Adams, who NatWest announced would testify regarding the value of Reilly's services. On May 5th, Reilly made a motion on "preclusion issues"

which, *inter alia,* sought: (1) preclusion of those witnesses NatWest had failed to produce in response to his Rule 30(b)(6) notice; and (2) an adverse inference jury instruction based on NatWest's failure to produce the Deal Files. The same day, while NatWest filed a pre-trial memorandum of its own, it failed to address either of Reilly's contentions.

On Tuesday May 5th, Judge Conti held a pre-trial conference to discuss Reilly's claims for contract and *quantum meruit* damages. Judge Conti ruled that Reilly could go to the jury on both his contract and *quantum meruit* claims, and that he could recover damages under either claim for both years of his employment. Also discussed at the May 5th conference were the preclusion and adverse inference measures sought by Reilly. Though Judge Conti reserved decision on Reilly's requests for those measures, during the hearing NatWest's lawyer—Jeffrey L. Liddle—was given an opportunity to, and did, argue against them. On the question of whether an adverse inference instruction was warranted, Liddle described Reilly's claimed need for the Deal Files as "bogus," insisting that every relevant document "that is in our possession . . . has been produced."

On Thursday, May 7th, NatWest informed Reilly that it had suddenly found the Deal Files. A NatWest investment banker submitted an affidavit stating that he discovered the Deal Files—some seven linear feet of documents—while getting a cup of coffee in a 10 × 20 foot kitchen adjacent to Reilly's old office. The Deal Files were delivered to Reilly at 3 p.m. on Friday, May 8th.

On that same Friday, Judge Conti held a final pre-trial conference. The events preceding that conference are disputed. Reilly claims that on Wednesday, May 6th, Judge Conti's chambers had directed the attorneys for both sides to appear on Friday to file their respective trial exhibits in the courtroom. Reilly points out that after NatWest revealed on May 7th that it had discovered the Deal Files, it telephoned Judge Conti's chambers on an *ex parte* basis in an unsuccessful attempt to obtain an adjournment. Reilly contends that during that communication, NatWest must have been informed that on the agenda for the Friday conference were the consequences of its failure to produce the Deal Files earlier. Reilly's version of events is supported by Judge Conti's explanation that he held the May 8th conference "to discuss the situation vis a vis the newly discovered Reilly files." *See* Post–Trial Order re Motion for Sanctions at 4.

NatWest denies that it was ever told that a purpose of the May 8th conference was to discuss the consequences of its failure to timely produce the Deal Files. Rather, it understood that the parties were to appear only to deliver exhibits for Monday's trial. According to NatWest, Liddle sent Richard Palmer, a first year associate, to deliver those exhibits, but when Palmer arrived he was "ambushed" with a sanctions hearing. NatWest sees something sinister in the May 8th conference and suggests that Reilly conspired to arrange an *ex parte* proceeding with Judge Conti, and that Reilly was prevented from doing so only by Palmer, who just "happened to walk into the courtroom . . . in the moments before the proceeding began."

While nothing in the record disproves NatWest's accusations, Palmer began the May 8th conference by introducing himself as "Richard Palmer representing the defendant NatWest." At no point thereafter did he raise any issue of surprise or lack of notice. Instead, when Reilly's counsel—Richard Claman—renewed his earlier motion for various sanctions based on NatWest's failures with respect to the Deal Files, Palmer responded by arguing:

I believe Mr. Claman is asking for drastic measures for documents that will prove to be of minimum importance to this case. . . . [F]or the last year NatWest has made a considerable effort to find any remaining documents since this has been an issue and they were just

stumbled upon yesterday.... Mr. Claman described it as gross negligence. I think NatWest's efforts in finding these were adequate. It was simply unfortunate that we didn't find them in the first place.

At the conclusion of the May 8th conference, Judge Conti granted Reilly the relief he sought (collectively, the "May 8 Rulings"). Specifically, focusing on NatWest's failure to produce the Deal Files, which he characterized as bordering on "willful" misconduct, Judge Conti ruled that: (1) an adverse inference instruction was warranted; and (2) NatWest would be barred from referring to Reilly's deposition and from using the Deal Files at trial. Judge Conti also concluded that it was appropriate to: (3) preclude the witnesses NatWest had failed to produce for deposition in response to Reilly's Rule 30(b)(6) notice; and (4) quash two subpoenas served by NatWest shortly before the May 8th conference because they were served in violation of Judge Sprizzo's order that Reilly be given five days notice of any third party subpoenas.

The damages trial began on May 11th, as scheduled. Just before the jury was selected, Reilly moved for a default judgment of $13.5 million—the amount sought by his complaint. Reilly argued that the Deal Files, which he had reviewed over the weekend, had been "sanitized" so that only publicly available documents had been turned over. Judge Conti declined to grant a default judgment, but rejected Liddle's explanation for the late production of the Deal Files and adhered to his prior ruling that he would give an adverse inference instruction to the jury.

During the ensuing nine-day damages trial, Reilly identified various documents that allegedly had been withheld from the Deal Files, including documents pertaining to transactions he claimed to have been involved in for KLM Airlines, Alaska Airlines, and Bombardier, a Canadian aircraft manufacturer. Reilly acknowledged that NatWest's total revenue from these and other transactions was only about $11 million. Nevertheless, he testified that the reasonable value of his services was about "$20 million." This apparent contradiction was, according to Reilly, explained by the fact that NatWest had "killed" many of his deals. In 1994, NatWest decided to redirect its focus away from underwriting and toward merger and acquisition work. It was Reilly's position that to keep this decision confidential, NatWest effected its new strategy through its credit committee which imposed commercially unreasonable requirements on his deals, thus keeping his revenues low. As a result, Reilly claimed the reasonable value of his services was not adequately reflected by the meager revenues he generated. Reilly's expert, Sorrel Mathes, supported Reilly's contention, testifying that investment banks customarily compensate bankers for all work performed, even on deals which do not close. This was so, according to Mathes, because banks place great stock in "[b]eing perceived as fair," since that allows them to retain more talented bankers, thus sustaining profits.

For the defense case, NatWest announced that it intended to call: (1) Jeffrey Letzler to testify about NatWest's document retention policies; and (2) both Letzler and Joseph Adams to testify about the specifics and value of Reilly's work. Reilly's counsel reminded Judge Conti that while both Letzler and Adams were on NatWest's witness list, neither one had been made available for deposition in response to his Rule 30(b)(6) notice. Judge Conti ruled that both witnesses could testify about the missing Deal Files; but he adhered to that part of his May 8 Ruling that neither one could testify about the value of Reilly's work.

Putting on its case, NatWest called its expert, Alan M. Johnson, who testified about the revenues generated by Reilly and who offered his opinion that the total value of Reilly's services was only about $3 million. To discredit Reilly's position that NatWest had kept his revenues low by

"killing" his deals through a commercially unjustified credit crunch, Liddle also elicited testimony from Stephen Sayre that NatWest's change in credit policy was commercially reasonable. On cross-examination, Reilly's counsel attempted to rebut Sayre's testimony in this regard by pointing to his earlier deposition, in which he had admitted disagreeing with the commercial logic of NatWest's change in credit practices. Sayre responded by trying to explain that change as a reaction to "the global recession ... in the early 1990's." Reilly's counsel countered by pointing out that 1995, the year NatWest allegedly "killed" Reilly's deals, was "a very good year in investment banking." When Sayre demurred, saying he was not "an economist," Reilly's counsel introduced, over objection, a NatWest annual report showing 1995 profits of $457 million.

The damages jury found that: (1) Reilly's *quantum meruit* damages were $5.5 million; and (2) his contract damages were $2.054 million. The jury also found that the amount NatWest owed Reilly and willfully refused to pay him in violation of New York's Labor Law was $1.054 million. Judge Conti awarded Reilly twenty-five percent liquidated damages of $263,500 on that $1.054 million pursuant to Section 198(1–a) of the Labor Law. Thereafter, the court required the plaintiff to choose between the contract damages and the *quantum meruit* award, and, not surprisingly Reilly elected to take his *quantum meruit* damages. Finally, Judge Conti awarded Reilly $1,361,250 in pre-judgment interest on the *quantum meruit* award calculated from August 25, 1995, the day after Reilly's termination. Total damages came to $7,124,750.

After trial, Judge Conti directed the parties to submit briefs on whether additional sanctions should be imposed on NatWest. Having held a hearing on the issue, Judge Conti confirmed his earlier impression that NatWest had been "grossly negligent" in: (1) searching for the Deal Files; and (2) failing to assure the integrity of the Deal Files. Despite these findings, Judge Conti declined to impose additional sanctions, or to grant Reilly's renewed motion for a default judgment. Judge Conti explained that his prior suggestion that NatWest had engaged in "willful" misconduct, had been made "at a time when I really didn't have all the facts before me."

After the post-trial sanctions hearing, NatWest filed a motion pursuant to Fed. R.Civ.P. 50 and 59 for judgment as a matter of law, which Judge Conti denied.

NatWest now appeals, arguing that Judge Conti erred when he: (1) allowed Reilly to recover *quantum meruit* damages; (2) awarded liquidated damages under the New York Labor Law; (3) awarded Reilly pre-judgment interest; (4) allowed Reilly to recover damages for 1994; (4) admitted evidence of NatWest's financial condition at trial; (5) made the May 8 Rulings; (6) imposed sanctions without due process; and (7) allowed Reilly to engage in unfair trial tactics. NatWest also requests that this case be reassigned on remand. Reilly cross appeals, arguing that Judge Conti erred when he: (1) declined to enter a default judgment against NatWest; and (2) dismissed his defamation claims.

## DISCUSSION

### I. Quantum Meruit *and Contract Damages*

NatWest argues that, as a matter of law, Reilly should not have been entitled to *quantum meruit* damages. We agree.

■ New York substantive law governs this diversity suit. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). We review a district court's interpretation of state law *de novo. See New York v. Blank*, 27 F.3d 783, 788 (2d Cir.1994).

■ Under New York law, the existence of an express contract governing a particular subject matter ordinarily precludes recovery in *quantum meruit* for

events arising out of the same subject matter. *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987). New York courts, however, have recognized an exception to this general rule and have held that in some circumstances the non-breaching party "may timely rescind and seek recovery" in *quantum meruit. Id.* Thus, in the employment context, an employee who is wrongfully discharged and prevented from completing the performance of his contract may choose between suing for breach of contract or for the value of the services rendered. *See Carvatt v. Lippner*, 82 A.D.2d 818, 439 N.Y.S.2d 681, 683 (2d Dep't 1981).

### A. *Election of Remedies*

■ The parties dispute whether in the circumstances of this case, Reilly could elect to rescind the contract and take his *quantum meruit* recovery after the damages trial. Reilly points to some authority suggesting that *quantum meruit* damages are always available as an alternative remedy upon any breach. *See Seymore v. Reader's Digest Assn., Inc.*, 493 F.Supp. 257, 264 (S.D.N.Y.1980). If that were so, any employee could, upon any breach however trivial, abandon the bargain memorialized by a valid contract and gamble on a higher *quantum meruit* recovery, secure in the knowledge that if he loses the gamble he may still recover under the contract. New York law does not countenance such a rule. *See Clark–Fitzpatrick*, 521 N.Y.S.2d at 656, 516 N.E.2d 190; *Babylon Assocs. v. County of Suffolk*, 101 A.D.2d 207, 475 N.Y.S.2d 869, 874 (2d Dep't.1984); *H.B.L.R., Inc. v. Command Broadcast Associates, Inc.*, 156 A.D.2d 151, 548 N.Y.S.2d 198, 199 (1st Dep't 1989) (citing *La Rose v. Backer*, 11 A.D.2d 314, 203 N.Y.S.2d 740, 746 (3rd Dep't 1960), *aff'd*, 11 N.Y.2d 760, 226 N.Y.S.2d 695, 181 N.E.2d 632 (1962)).

■ NatWest, for its part, maintains that where an employee has substantially performed under the contract he loses the right to rescind and seek a *quantum meruit* remedy. While not entirely without support, *see La Rose*, 203 N.Y.S.2d at 745–46, no New York court has endorsed this specific doctrine (nor has NatWest ever proved that Reilly did substantially perform under his contract). We agree with NatWest, however, that a victim of a breach may not rescind "in the absence of compelling equitable grounds." *H.B.L.R., Inc.*, 548 N.Y.S.2d at 199; *see Babylon Assocs.*, 475 N.Y.S.2d at 874 (identifying the grounds for recission under New York law as failure of consideration, fraud in the inducement, inability to perform, or a breach that substantially defeats the purpose).

■ We need not decide these academic issues, interesting though they be, for the simple reason that Reilly never timely rescinded his express contract. Although a plaintiff may sometimes defer the election of remedies and seek damages from a jury on alternative theories of breach of contract and *quantum meruit*, *see* David D. Siegel, *Practice Commentaries* C3002:5, N.Y. C.P.L.R. § 3002 (McKinney 1991), *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996), this is true only where there is a dispute over the existence, scope, or enforceability of the putative contract. *See id.;* 22 N.Y.Jur.2d, *Contracts* § 532 (1996). Conceptually, the two remedies are "mutually exclusive", and the express contract controls. 22 N.Y.Jur.2d, *Contracts* § 532; *see Clark–Fitzpatrick*, 521 N.Y.S.2d at 656, 516 N.E.2d 190; *H.B.L.R, Inc.*, 548 N.Y.S.2d at 199; A. Corbin, *Corbin on Contracts*, § 1110, at 590–91 (1964).

■ In this case, the liability jury determined that Reilly had an enforceable contract that governed his termination. Once that jury found that Reilly had an enforceable contract, he could not seek to recover under *quantum meruit* in the subsequent damages trial. Although it might be argued that Reilly could have elected to rescind his contract after the liability verdict,

*see* N.Y. C.P.L.R. § 3002(e) (McKinney 1991), no grounds for such a recission are urged, nor do we find any. *See Babylon Assocs.,* 475 N.Y.S.2d at 874. "A 'recission' amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination." *Black's Law Dictionary* 1174 (5th ed.1979). Endeavoring to enforce one's right to damages under a valid contract that expressly governs the subject at issue—as Reilly did here—is simply irreconcilable with rescinding or "unmaking" it from the beginning and suing in *quantum meruit. Id.; see Clark–Fitzpatrick,* 521 N.Y.S.2d at 656, 516 N.E.2d 190. Because Reilly "chose not to rescind the agreement" his recovery is limited by the terms of his express contract. *Clark–Fitzpatrick,* 521 N.Y.S.2d at 656, 516 N.E.2d 190.

### B. *Amount of Contract Damages*

█ Turning to the issue of how much Reilly was entitled to recover under the terms of the contract, we find it unclear how the jury arrived at $2.054 million as contract damages. That amount, when added to the $1.4 million NatWest actually paid Reilly, fixes his total compensation for 1994 and 1995 at $3.454 million, some $484,000 more than the $2.97 million provided for by the unambiguous terms of the contract. While the jury's finding in this regard may have been erroneous, we will not tarry over this issue. As is evident from NatWest's briefs, and as counsel conceded at oral argument, NatWest does not challenge the amount of contract damages awarded. Accordingly, any cavil that NatWest may now have with respect to the jury's award of contract damages has been waived. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998).

### II. *Liquidated Damages Under New York Law*

█ Under New York's Labor Law, when an employer willfully refuses to pay an employee, "the court shall allow such employee ... an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due." N.Y. Labor Law § 198(1–a) (McKinney 1986). The Labor Law defines "wages" as the "earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." *Id.* § 190(1).

Despite this sweeping definition, NatWest maintains that Judge Conti erred in awarding liquidated damages under the Labor Law because "incentives" like Reilly's Percentage Bonus are not "wages." NatWest relies heavily on *dicta* from *Dean Witter Reynolds, Inc. v. Ross,* 75 A.D.2d 373, 429 N.Y.S.2d 653, 658 (1st Dep't 1980), that "[t]he term 'wages,' ... does not encompass an incentive compensation plan."

*Dean Witter* is unhelpful to NatWest. In that case, the employee stockbroker's contract provided that he would receive incentive pay based on the profits he generated, minus certain deductions for his administrative and trading expenses. *See id.* at 655. The Industrial Commissioner of the State of New York ordered the employer to stop taking those deductions from the employee's pay, and to reimburse the employee for the deductions already taken. The Department of Labor affirmed that order, concluding that the deductions represented withheld "wages" under the Labor Law. The Appellate Division reversed. The court stated: "[w]e hold ... that [the Labor Department] applied the definition of the term 'wages' prematurely" because the "'incentive pay' did not become earned" and the employee "had no vested interest in the additional compensation until ... all appropriate adjustments were made in conformity with the incentive ... plan." *Id.* at 658.

*Dean Witter* stands for the unremarkable proposition that incentive pay does not constitute a "wage" until it is actually earned and vested. This is consistent with the holdings of subsequent New York cases. *See Tuttle v. Geo. McQuesten Co.,* 227 A.D.2d 754, 642 N.Y.S.2d 356, 358 (3d

Dep't 1996) (commissions based on percentage of sales were "wages" because they were "earned" and the employee had "a vested right to [them] at the time of his resignation"); *Daley v. Related Cos.,* 179 A.D.2d 55, 581 N.Y.S.2d 758, 759, 762 (1st Dep't 1992) (compensation comprised of "commissions based on [percentage of] real estate syndications" were "wages" covered by the Labor Law).

Here, Reilly's pay was guaranteed under the Percentage Bonus formula to be a percentage of the revenues he generated, and was not left to NatWest's discretion. The jury found that NatWest owed Reilly $2.054 million under his contract, but that it willfully withheld $1.054 million from that amount. Unlike the employee in *Dean Witter,* Reilly was clearly entitled to that $1.054 million as earned and vested compensation. *See Weiner v. Diebold Group, Inc.,* 173 A.D.2d 166, 568 N.Y.S.2d 959, 961 (1st Dep't 1991). As such, Reilly's Percentage Bonus falls comfortably within the definition of a "commission" that is expressly included within the Labor Law's definition of "wages." N.Y. Labor Law § 190(1); *see Caruso v. Allnet Communications Servs., Inc.,* 242 A.D.2d 484, 662 N.Y.S.2d 468, 469 (1st Dep't 1997) (" 'commission' ... is generally viewed as earned non-forfeitable compensation") (citing *Tuttle,* 642 N.Y.S.2d at 358).

### III. *Pre-judgment Interest*

Relying on *In re CIS Corp.,* 206 B.R. 680 (Bankr.S.D.N.Y.1997), NatWest argues that Reilly's award of liquidated damages on his Labor Law claim is intended to be in lieu of interest; and, therefore, he is not entitled to pre-judgment interest on his contract damages pursuant to N.Y. C.P.L.R. § 5001(a) (McKinney Supp.1999). In *CIS,* 206 B.R. at 690, the bankruptcy court declined to grant pre-judgment interest on the ground that:

> Since liquidated damages [under the Labor Law] are in the nature of compensation for the lost use of wages, they are the functional equivalent of pre-judg-

ment interest. To award ... both prejudgment interest and liquidated damages would provide [plaintiff] redress twice for the same loss.

This rationale is unpersuasive. Prejudgment interest and liquidated damages under the Labor Law are not functional equivalents. "The purpose of a prejudgment interest award in a wrongful termination case is to compensate a plaintiff for the loss of use of money." *Chandler v. Bombardier Capital Inc.,* 44 F.3d 80, 83 (2d Cir.1994). In contrast, liquidated damages under the Labor Law "constitute a penalty" to deter an employer's willful withholding of wages due. *Carter v. Frito-Lay, Inc.,* 74 A.D.2d 550, 425 N.Y.S.2d 115, 116 (1st Dep't 1980), *aff'd.,* 52 N.Y.2d 994, 438 N.Y.S.2d 80, 419 N.E.2d 1079 (1981).

Accordingly, because liquidated damages under the Labor Law and pre-judgment interest serve fundamentally different purposes, on remand the district court shall award Reilly pre-judgment interest on the $2.054 million awarded in contract damages. *See* N.Y. C.P.L.R. § 5001(a). Because NatWest would not have paid Reilly that $2.054 million on one fixed date, however, the district court should award interest from a date to be determined in accordance with New York law. *See* N.Y. C.P.L.R. § 5001(b) (McKinney Supp.1999) ("[w]here ... damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all the damages from a single reasonable intermediate date").

### IV. *1994 Damages*

NatWest next contends that Judge Conti erred in giving the jury a verdict form asking for a "lump-sum" damages amount for both 1994 and 1995. According to NatWest, Reilly's contract was divisible because it was expressly apportioned into two separate employment periods—1994 and 1995—with separate compensation terms for each year. Pointing out that the liability jury found that Reil-

ly's contract was breached in 1995, NatWest claims that the damages jury should never have been allowed to consider contract damages for 1994. This is so, according to NatWest, because a plaintiff cannot recover damages under a divisible contract "for the parts completed before the contract is breached." NatWest misapprehends the nature of a divisible contract.

■ A divisible contract "differs from other contracts only in the respect that on performance by one party of each of its successive divisions, the other party becomes liable for his or her performance of that division." 22 N.Y.Jur.2d, *Contracts* § 269 (1996) (citing *Rhine v. New York Life Ins. Co.*, 248 A.D. 120, 289 N.Y.S. 117, 123 (1st Dep't), *aff'd.* 273 N.Y. 1, 6 N.E.2d 74 (N.Y.1936)). Thus, while an employee may sometimes be barred from recovering under that part of a divisible contract that he or she has fully performed, this is so only if the employee has "received *in full* the apportioned equivalent of [the employer's] performance." 5 *Corbin on Contracts*, § 1111, at 591 (emphasis added). Otherwise, as in any breach of contract case, "the employee has a right to the payment of the wage installment; and the duty of the employer to pay that amount is a contract debt." *Id.* § 1095, at 515; *See, e.g., Medecon Office Systems, Inc. v. Patterson, Zimmerman & Hodes, M.D., P.C.*, 166 A.D.2d 694, 561 N.Y.S.2d 646, 646 (2d Dep't 1990) (plaintiff entitled to full payment for work actually performed under part of divisible contract).

In short, even if Reilly's contract were divisible, that does not mean he is barred from recovering damages for 1994, so long as such damages were actually due. From the outset of this litigation, Reilly has consistently maintained that NatWest owed him money for 1994, alleging in his complaint that "NatWest has breached its obligation ... to pay ... $242,562 earned by Reilly for the '1994' year." It was not error, therefore, for the district court to solicit a "lump-sum" damages figure from the jury.

### V. *The "Wealth" Evidence*

■ NatWest argues that admitting its annual report as evidence of its financial condition requires reversal. NatWest asserts that the evidence of its $457 million profit in 1995 was improperly admitted because it did not actually contradict Sayre's testimony that there was a recession in the early 1990's. We disagree.

■ A trial court's evidentiary rulings are entitled to substantial deference, and are reviewed only for clear abuse of discretion. *See Healey v. Chelsea Resources, Ltd.*, 947 F.2d 611, 619–20 (2d Cir.1991). "Further, even an erroneous evidentiary ruling will not lead to reversal unless affirmance would be 'inconsistent with substantial justice.'" *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir.1997) (quoting Fed.R.Civ.P. 61).

■ Evidence of wealth, "which can be taken as suggesting that the defendant should respond in damages because he is rich," is generally inadmissible in trials not involving punitive damages. *Koufakis v. Carvel*, 425 F.2d 892, 902 (2d Cir.1970); *see* Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 401.08[6] (2d ed.1998). Nevertheless, such evidence may be admitted to impeach the testimony of a witness who "open[s] the door" to the subject. *Textile Deliveries, Inc. v. Stagno*, 52 F.3d 46, 49 (2d Cir.1995). Of course, to be admitted for this purpose, the wealth evidence must actually be inconsistent with the witnesses's testimony. *See United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).

■ We agree with NatWest that the wealth evidence did not directly contradict Sayre's testimony, and that its introduction may have been somewhat opportunistic. Nevertheless, that evidence was sufficiently inconsistent with Sayre's testimony to impeach his credibility. Specifically, the wealth evidence revealed that Sayre—to

paraphrase his own term—was being somewhat economical with the truth. Sayre suggested that the early 1990's recession was a legitimate business reason for NatWest's decision to tighten credit in 1995. In response, Reilly was entitled to contend that NatWest turned a tidy profit in 1995 and that, therefore, its decision to tighten credit in that year was commercially unsound. In any case, even if Reilly's attempt to impeach Sayre's credibility was prejudicial, any prejudice was dissipated by Judge Conti's instruction to the jury that a party's wealth "must not enter into your judgment nor influence your decision in any respect."

## VI. *The May 8 Rulings*

NatWest next raises substantive objections to each of the May 8 Rulings, none of which warrant reversal.

■ Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses, *see New York State NOW v. Terry*, 886 F.2d 1339, 1354 (2d Cir.1989), and for the spoliation of evidence. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999).

### A. *The adverse inference instruction*

At the beginning and close of trial Judge Conti instructed the jury that if Reilly proved that: (1) NatWest had failed to deliver the Deal Files in a timely fashion or that it delivered them incomplete; and (2) that such "nondelivery" prejudiced Reilly because the files were important to him, "then you can infer these matters in his favor and against NatWest." The court premised this instruction on its finding that NatWest had acted with "gross negligence" in searching for, and preserving, the Deal Files.

The law in this Circuit regarding the level of fault necessary to justify an adverse inference instruction is unsettled. In *Kronisch v. United States*, 150 F.3d 112

(2d Cir.1998), it is suggested that district courts must find that a party intentionally destroyed evidence before giving an adverse inference instruction. *See id.* at 126–27 & n. 11 (2d Cir.1998) (citing *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir.1988)). Similarly in *Berkovich v. Hicks*, 922 F.2d 1018, 1024 (2d Cir.1991), we affirmed a district court's refusal to grant a plaintiff an adverse inference instruction, noting that absent "any evidence of bad faith," plaintiff was not entitled to such an instruction. *Berkovich*, however, avoided announcing a *per se* rule; instead it explicitly limited its holding to "the facts of this case," thereby leaving open the possibility that, in certain circumstances, an adverse inference instruction would be appropriate even without a finding of bad faith. *See id.*

■ We do not read either *Kronisch* or *Berkovich* as an absolute prohibition against granting an adverse inference instruction where there is no bad faith but there is gross negligence. To the contrary, we have previously approved more severe sanctions based solely on gross negligence. *See Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir.1979) (holding that a plaintiff's grossly negligent failure to produce discovery justified the preclusion of all evidence related to damages, even though that sanction was "tantamount to a dismissal" of plaintiff's claim).

Our case-by-case approach to the failure to produce relevant evidence seems to be working. Such failures occur "along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Welsh*, 844 F.2d at 1246. Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case. *See West*, 167 F.3d at 779. As other Circuits have recognized, it makes little sense to confine promotion of that remedial purpose to cases involving

only outrageous culpability, where the party victimized by the spoliation is prejudiced irrespective of whether the spoliator acted with intent or gross negligence. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir.1995); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Pressey v. Patterson*, 898 F.2d 1018, 1023–24 (5th Cir.1990); *Welsh*, 844 F.2d at 1246.

■ Thus, we hold that a finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator with an adverse inference instruction. Here, it is clear that NatWest exhibited at least the gross negligence found by Judge Conti in light of: (1) NatWest's failure to produce the Deal Files until the eleventh hour; and (2) Reilly's showing at trial—through the identification of missing documents—that NatWest "sanitized" those files. In these circumstances, we cannot say that the district court abused its discretion by granting Reilly an adverse inference instruction.

### B. *Preclusion of NatWest's additional "fact" witnesses*

NatWest maintains that Judge Conti abused his discretion when he precluded "all five" of its "fact witnesses" who were not produced for deposition in response to Reilly's Rule 30(b)(6) notice. We disagree.

■ First of all, the district court did not, as NatWest alleges, actually preclude five "fact witnesses" from testifying. Instead, Judge Conti authorized NatWest to call Letzler and/or Adams to testify about its document retention policies, even though neither witness had been produced in response to Reilly's Rule 30(b)(6) notice. NatWest chose not to call either witness on the subject of document retention. Nor did it call any other witness who, it now claims, would have testified to some unspecified "facts." Because we cannot know whether any witnesses called would have been precluded had they, like Adams and Letzler, been offered at trial, we deem

NatWest's challenge to their purported preclusion an issue not actually "passed upon below" and therefore waived. *See Austin v. Healey*, 5 F.3d 598, 601 (2d Cir.1993) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). Thus, we confine our analysis to whether Judge Conti abused his discretion in precluding Letzler and Adams from testifying about Reilly's work (testimony that remains germane to this appeal notwithstanding our rejection of Reilly's *quantum meruit* claim because it would also have been relevant to the revenues generated by Reilly for purposes of his contract claim).

■ Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject. *See* Fed.R.Civ.P. 30(b)(6); James Wm. Moore *et al.*, *Moore's Federal Practice*, ¶ 30.25[3] (3d ed.1998). To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available "such number of persons as will" be able "to give complete, knowledgeable and binding answers" on its behalf. *Securities & Exchange Comm'n v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y.1992) (quotations omitted); *see Moore's Federal Practice*, at ¶ 30.25. When a party fails to comply with Rule 30(b)(6), Rule 37 allows courts to impose various sanctions, including the preclusion of evidence. *See* Fed.R.Civ.P. 37(b)(2)(B); *see, e.g., Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 770–71 (9th Cir.1995).

■ To comply with Rule 30(b)(6), as well as Judge Sprizzo's order regarding the completion of discovery, NatWest was required to produce for deposition by March 31, 1998 such of its representatives who were familiar with the specifics and thus the value of Reilly's work. NatWest chose to produce only Sayre by that date, despite Reilly's complaints that Sayre was not sufficiently knowledgeable about Reilly's work. Nevertheless, before and dur-

ing trial, NatWest sought to have Adams and Letzler testify on that very issue, claiming that they were knowledgeable in that area. By failing to produce Adams and Letzler for deposition, NatWest violated Rule 30(b)(6). Moreover, by failing to produce those witnesses in a timely fashion, NatWest violated Judge Sprizzo's order regarding the completion of discovery.

Having determined that NatWest violated both Rule 30(b)(6) and Judge Sprizzo's order, we have little difficulty in concluding that barring Adams and Letzler from testifying about Reilly's work was proper. In assessing the propriety of a district court's preclusion of witness testimony, we consider the following factors:

> (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 961 (2d Cir.1997); *see Outley v. City of New York,* 837 F.2d 587, 590–91 (2d Cir. 1988).

Judge Conti did not abuse his discretion in precluding the testimony of Adams and Letzler because: (1) even to this day NatWest has never explained why they were not made available for deposition; (2) their testimony would have been cumulative in light of the testimony of NatWest's expert, Johnson and, to a lesser extent, of Sayre on the subject of Reilly's work; (3) Reilly would have been prejudiced by the fact that he did not have an opportunity to depose them; and (4) due to what would have been the cumulative nature of their testimony, delaying the trial to allow Reilly to conduct such a deposition would have been wholly unwarranted. *See Softel,* 118 F.3d at 961–63.

**C. *Other allegedly improper May 8 Rulings***

In view of NatWest's failure to produce the Deal Files until the eve of trial, we cannot say that the district court abused its discretion by barring NatWest from using those files at trial. *See Softel,* 118 F.3d at 963; *Cine Forty–Second St. Theatre Corp.,* 602 F.2d at 1068. In any case, any error was harmless, as even now NatWest cannot point to a single document from those files that could have been important to its case. Instead, it argues only that it would have used the Deal Files to demonstrate the lack of documentation substantiating Reilly's contract claims. As NatWest is aware, however, Reilly himself complained about the lack of such documentation repeatedly during trial. Thus, NatWest has failed to show prejudice arising from the preclusion of the Deal Files.

Similarly, Judge Conti did not abuse his discretion in barring NatWest from using Reilly's deposition to impeach his testimony at trial. During that deposition, Liddle questioned Reilly repeatedly about the extent of his participation in various transactions. Frequently, Reilly was unable to give specific answers because he did not have his Deal Files. Preventing NatWest from capitalizing on Reilly's inability to describe his specific participation in various transactions was an eminently fair exercise of Judge Conti's discretion.

Finally, the trial judge did not abuse his discretion in quashing the third party subpoenas served in violation of Judge Sprizzo's unequivocal order that Reilly receive five days notice of such subpoenas. NatWest contends that because that order had been issued before the liability trial, it did not apply to damages discovery. The record simply does not support that contention.

**VII. *Due Process***

NatWest argues that the May 8th Rulings were essentially sanctions and that

they were imposed without affording it due process. We disagree.

█ We review a sanctions decision for abuse of discretion, *see Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir.1997), mindful that a district court necessarily abuses its discretion when it imposes sanctions without due process. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

"[D]ue process requires that courts provide notice and an opportunity to be heard before imposing *any* kind of sanctions." *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 70 (2d Cir.1996) (emphasis in original) (citing *Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir.1995)). While we have not hesitated to reverse where there is "no indication" that a sanctioned party was afforded notice of the particular sanctions sought, *Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir.1997); *see Ted Lapidus*, 112 F.3d at 96, or where the party is not permitted to argue against the sanctions imposed, *see Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 927 (2d Cir.1992), we have also recognized that the requirements of due process cannot be cabined within an inflexible regime, and must vary with each case. *See, e.g., International Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1286 (2d Cir.1994); *see also Martin*, 63 F.3d at 1262. Thus, in the Rule 37 context, we have declined to impose rigid requirements on either the timing or the form of the notice afforded to a sanctioned party. *See, e.g., Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 128 F.3d 99, 102 (2d Cir.1997) (*per curiam*) (motion filed one day prior to district court's preliminary sanctions decision provided sufficient notice). Nor have we required that a party always be allowed to argue orally. *See, e.g., International Ore*, 38 F.3d at 1286 (party filing affidavit that failed to address pending sanctions motion nevertheless had sufficient opportunity to be heard).

Here, NatWest received all the process it was due. As a preliminary matter, in the circumstances of this case we cannot agree with Reilly that none of the May 8 Rulings were actually sanctions, but were instead merely "trial-management rulings" to which the protections of due process do not attach. *See West*, 167 F.3d at 780 (characterizing adverse inference instruction as a "sanction"); *Outley*, 837 F.2d at 590–91 (treating preclusion of testimony as a "sanction"); *see also G.J.B. & Associates, Inc. v. Singleton*, 913 F.2d 824, 830 (10th Cir.1990) ("the process due if a district court threatens to strike testimony is more substantial than that required for the imposition of attorneys' fees and costs related to a deposition, the latter being a relatively moderate sanction.").

█ Nevertheless, not all the May 8 Rulings may be characterized as sanctions to which the requirements of particularized notice attach. Judge Conti's decision to quash the trial subpoenas served in violation of Judge Sprizzo's prior order, was, or should have been, entirely foreseeable to NatWest. Parties and counsel have no absolute right "to be warned that they disobey court orders at their peril." *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir.1991). Similarly, NatWest had an adequate opportunity to argue against the preclusion of the proposed testimony of Adams and Letzler, where Judge Sprizzo's discovery order required their depositions prior to March 31, 1998, and where NatWest had specific notice as of May 5, 1999 that Reilly sought such preclusion. *See International Ore*, 38 F.3d at 1286.

█ Nor did Judge Conti deprive NatWest of notice and an opportunity to be heard before imposing the sanctions related to the Deal Files. NatWest was on notice as of May 5th that Reilly sought sanctions arising from its failure to produce those files, and Palmer was given an opportunity to, and did, argue against such sanctions at the May 8th conference. That Palmer, a first year associate, was the sole representative of NatWest at the May 8th

conference does not mean that the adverse inference instruction was given without due process. In the present circumstances, we see no reason to eschew application of the general rule that civil litigants are bound by the acts and omissions of their freely selected attorneys. *See Securities and Exch. Comm'n v. McNulty*, 137 F.3d 732, 739 (2d Cir.1998). Moreover, on May 11th, just before trial began, Liddle himself attempted to explain NatWest's failure to produce the Deal Files. The fact that Judge Conti rejected that explanation does not give rise to a due process violation.

## VIII. *Unfair Trial Tactics*

 NatWest complains that Judge Conti improperly allowed Reilly to appeal to the emotions of the jury during trial by: (1) repeatedly accusing NatWest of discovery wrongdoing; (2) encouraging the jury to "send a message" to NatWest that contracts mean something; and (3) telling the jury that NatWest had been found guilty of "willful" and "wrongful" discharge. We disagree. A district court is entitled to give attorneys wide latitude in formulating their arguments. *See Matthews v. CTI Container Transport International, Inc.*, 871 F.2d 270, 278 (2d Cir.1989). Rarely will an attorney's conduct so infect a trial with "undue prejudice or passion" as to require reversal. *See id.* In this case, we are satisfied that the conduct of Reilly's counsel was not so prejudicial as to warrant a new trial.

## IX. *Reilly's Cross–Appeals*

Reilly cross-appeals the district court's denial of his motion for a default judgment and dismissal of his defamation claims. These cross-appeals are denied.

 First, Judge Conti did not abuse his discretion in declining to grant Reilly the ultimate sanction of a default judgment and in determining that the lesser sanction of an adverse inference instruction was sufficient to redress NatWest's gross neg-

ligence with respect to the Deal Files. *See West*, 167 F.3d at 780.

 Second, Judge Conti properly dismissed Reilly's defamation claims. The first alleged defamation arose from a conversation between Adams and Peter Hall, two of Reilly's superiors at NatWest, during which Adams allegedly told Hall that Reilly's performance was unsatisfactory. This claim was properly dismissed as a statement of opinion. *See Williams v. Varig Brazilian Airlines*, 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (1st Dep't) (criticism of an employee's work performance is opinion and cannot be defamatory), *lv. to appeal denied*, 78 N.Y.2d 854, 573 N.Y.S.2d 467, 577 N.E.2d 1059 (1991). The second alleged defamation also was properly dismissed. While plaintiffs are not required to plead defamation *in haec verba*, Reilly's unsupported claim that Adams said "something bad" about him to a client failed to afford NatWest "sufficient notice of the communications complained of to enable [it] to defend [itself]." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (citation omitted).

## X. *Reassignment*

 As a final matter, we address NatWest's request that this case be reassigned on remand to a district judge who was not involved in the original proceedings. We note that in light of our disposition of this appeal, the only issues that remain for remand are: (1) the amount of pre-judgment interest Reilly is entitled to on his contract damages; and (2) the amount of attorney's fees Reilly is entitled to pursuant to § 198(1–a) of the Labor Law, a question not litigated on this appeal. In any event, we are unconvinced that reassignment would further the appearance of justice, or that either of the judges who were involved in the original proceedings would have any difficulty putting aside previously expressed views. *See United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (*en banc*). Nor has any showing of personal bias been made. *See id.* (citing

28 U.S.C. § 144). Accordingly, we decline to require reassignment of this case.

## CONCLUSION

We have considered the parties' remaining contentions and find them to be without merit. The award of *quantum meruit* damages is reversed, and this case is remanded for entry of judgment in favor of Reilly on his contract damages of $2.054 million. The district court shall award pre-judgment interest on those damages from a date to be determined in accordance with New York law. The award of liquidated damages under the Labor Law is affirmed. Judge Conti's refusal to award Reilly a default judgment is affirmed as is his dismissal of Reilly's defamation claims.