Robert F. BYRNIE, Plaintiff,

v.

TOWN OF CROMWELL PUBLIC
SCHOOLS and Cromwell Board
of Education, Defendants.

No. 3:97CV01572(GLG).

United States District Court,
D. Connecticut.

Oct. 25, 1999.

Beecher A. Larson, East Haven, CT, for plaintiff.

Jennifer Bullock Majewski, Shipman & Goodwin, Hartford, CT, for defendants.

## OPINION

GOETTEL, District Judge.

■ Plaintiff has filed this employment discrimination complaint under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq., claiming discrimination on the basis of his gender, male,[1] and under the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 et seq., claiming discrimination on the basis of his age, 64, in defendants' failure to select him for a permanent, part-time art teacher position at Cromwell High School. Plaintiff also asserts claims under the comparable provisions of Connecticut's Fair Employment Practices Act ("CFEPA"), C.G.S.A. § 46a–60(a)(1).[2] Plaintiff's claims are premised upon both disparate treatment and disparate impact theories of discrimination. Defendants now move for summary judgment on all counts of plaintiff's amended complaint.

## BACKGROUND

Robert F. Byrnie was born on July 27, 1930, and was 64 years of age at the time of the alleged discriminatory events.

In June of 1995, defendants advertised for a permanent, part-time[3] art teacher for the public high school in Cromwell, Connecticut. Applicants were directed to submit a letter of application along with a resume, transcripts, proof of Connecticut certification, and a letter of reference. The required qualifications for the position were: a B.S./B.A. degree in art education, a teaching certificate in art education, and two years of teaching experience.

At the time this opening was announced, plaintiff was substitute teaching at the Cromwell High School and heard about the opening. He submitted his resume, transcripts, and his Connecticut State teaching certificate to Mr. Mark J. Nappi, principal of the High School. Plaintiff's resume indicated that he possessed both Bachelor's and Master's Degrees in Art Education. He held a "Professional Educator Certificate" from the Connecticut State Board of Education and was certified to teach at the high school level in three areas: Art, History and Social Studies, and in External Diploma Program/Non-credit Mandated Programs .(Adult Education). Plaintiff's resume also indicated that he had worked as an art teacher at four secondary public schools in another school system for 21½ years, where he served as a "master teacher,"[4] and as a system-wide art department chairman over four schools. For six years prior to applying for the position at issue, plaintiff had taught various classes, including art classes, as a substitute teacher at Cromwell High School. He also served as the Advisor to the High School's Literary Magazine under the auspices of the English Department from 1993 to 1995, for which he received a yearly stipend. Plain-

---

1. Although plaintiff's amended complaint also cites discrimination on the basis of race, color, religion, and national origin, (Am.Compl. at 2, ¶ 2), plaintiff offers no evidence to support these claims of discrimination and does not pursue them elsewhere in his complaint or mention them in his extensive opposition papers to the motion for summary judgment. These claims of discrimination also were not raised in his administrative charge. It does not appear to us that plaintiff ever intended to pursue such claims, and, even if he did, they would be dismissed by this Court for, inter alia, failure to exhaust administrative remedies.

2. The same legal standards apply to discrimination claims under the CFEPA as under Title VII and the ADEA. See Levy v. Commission of Human Rights & Opportunities, 236 Conn. 96, 108, 671 A.2d 349 (1996).

3. The position was characterized as a ⅗ or .6 position since it involved a teaching load of approximately 60% of a full teaching load.

4. A "master teacher" is one who has been qualified to train student teachers.

tiff included with his application letters of recommendation (others were already in his file) and his transcripts.

Esther Mancarella, who was ultimately chosen for the art teacher position, was an art teacher at the Learning Center of the Children's Home of Cromwell,[5] at the time she applied. She had over seven years of experience teaching art at the middle school level and six years of experience at the Children's Home. She had obtained a B.A. in Fine Arts from Wesleyan University, where she had graduated *Magna Cum Laude,* and she had taken masters' level courses and graduate courses. She attached letters of recommendation, statements of her teaching philosophy, and transcripts from Wesleyan University, but did not attach transcripts from other undergraduate institutions she had attended

before Wesleyan. She was certified by the Connecticut Board of Education to teach art at the high school level. Ms. Mancarella was 42 at the time she applied for this position.[6]

■ The hiring process was a multi-step process based upon the "Recommended Procedures for Hiring" adopted by the Cromwell Board of Education in 1992. Initially, the 41 applications that had been submitted were "pre-screened" by Principal Mark Nappi (male, age 51), and two members of the Board of Education (Charlene Barber, female, age 38, and Mary De Maio, female, age 39) to remove the incomplete applications [7] and those that did not meet minimum qualifications. Of the original 41 applicants, 38 were female and 3 were male.[8] The number of applicants

5. The Children's Home is a residential treatment center for children who, for the most part, are identified as Socially Emotionally Maladjusted. The children range in age from 8 to 17. Ms. Mancarella taught 65 to 72 children per week.

6. Ms. Mancarella's age would have been apparent from her transcripts. It is undisputed that defendants were generally aware of plaintiff's age. (Nappi Dep. at 113).

7. There is some question as to exactly what factors were used in this initial screening process. Principal Nappi testified that there were no criteria or qualifications used to screen the applications. They were not ranked. The committee selected applications just by looking at them. He did not recall whether they eliminated applications that were not complete. (Nappi Dep. at 102–104).

8. Defendants did not retain the applications of the unsuccessful candidates following the selection process and, thus, we do not have information on the ages of all of the applicants or their qualifications. Plaintiff maintains that defendants intentionally and knowingly destroyed these documents and asks this Court to draw an adverse inference of discrimination against defendants as a result of this destruction of evidence. According to defendants, the only documents that plaintiff has requested that no longer exist are the application materials of the other unsuccessful applicants, which were shredded in the regular course of business. *See* (Gere Dep. at

27; Cassella Dep. at 16). Defendants assert that these documents could have "absolutely no logical relevance" to the facts of this case. Moreover, they argue that plaintiff has offered no evidence that they were "deliberately and intentionally" destroyed or that the documents were destroyed in bad faith, which plaintiff must show before he is entitled to an adverse inference.

We disagree with defendants that these documents could have no possible relevance to the facts of this case. The qualifications of the other candidates and how the Selection Committee evaluated their applications might have some relevance to plaintiff's claims that the Selection Committee discriminated against him in terms of the ranking of his application prior to the interviews. However, any relevance they might have had would be minimal since there is no evidence that these rankings entered into the ultimate selection decision, and plaintiff was one of the five applicants chosen for an interview. *See* discussion at 27–28, *infra.*

Furthermore, plaintiff has not shown, as a matter of law, that an adverse inference should be drawn because these applications were not retained. The law in the Second Circuit regarding the level of fault necessary to justify an adverse inference instruction is unsettled. *See Reilly v. Natwest Markets Group, Inc.,* 181 F.3d 253, 267 (2d Cir.1999). In *Kronisch v. United States,* 150 F.3d 112, 126–27 & n. 11 (2d Cir.1998), the Court suggested that a district court must find that a party intentionally destroyed evidence before

was narrowed down to 21 candidates, including plaintiff and one other male applicant.

After the initial screening, a Selection Committee was established, consisting of the three members of the Screening Committee identified above, plus two staff members who occupied disciplines similar to the one in which a job opening existed, and an additional administrator. The additional staff members were Cromwell High School English teacher Douglas Ross (male, age 58) and art teacher Aline Grandazzo (female, age 45). The administrator was the High School's Assistant Principal Joseph Cassella (male, age 40). Thus, of the six committee members, three were males, age 40 or over, one was a female over the age of 40, and two were females under 40. The Committee reviewed the 21 applications, rating them on a 1-to-5 scale, and agreed to grant interviews to the five applicants who received the highest cumulative scores. The top five candidates received the following total points:

| | |
|---|---|
| Ms. Mancarella (female, age 42) | -- 18 |
| EB (female, age 41) | -- 17 |
| MD (female, age 39) | -- 17 |
| Mr. Byrnie (male, age 64) | -- 16 |
| LE (female, age?) | -- 16 |

Because one of the five individuals selected had already accepted another position, and the next three alternates (who had scores of 15) were unavailable for interviews, the field was narrowed to four candidates.

The next step in the hiring process was for the Selection Committee to interview the four candidates. All members of the Selection Committee participated with the exception of Mr. Ross, who was unavailable. Each applicant was asked the same questions by the same Committee members in the same order. Principal Nappi testified that, following the interviews, the Committee discussed the candidates and then each member identified his or her top three choices, with the first choice receiving a "1." Four of the five committee members ranked Ms. Mancarella first; one ranked her second. Only one person ranked plaintiff second, and one ranked him third. The vote taken after the interviews resulted in the following ranking of the four candidates,[9] who went on to the next step in the selection process:

| | |
|---|---|
| Ms. Mancarella | -- 1, 1, 1, 1, 2 |
| EB | -- 1, 2, 2, 2, 3 |
| MD | -- 3, 3, 3 |
| Mr. Byrnie | -- 2, 3 |

Principal Nappi states that during this first-round of interviews, plaintiff spent a considerable amount of time meticulously showing the Committee his portfolio, which consisted of a 15-unit, self-designed curriculum. Rather than directly responding to the questions posed, plaintiff discussed at length each of the 15 units of his portfolio. For example, plaintiff explained the first five units of his portfolio in response to a question regarding the most important attribute of a good teacher rath-

---

giving an adverse inference instruction. In *Berkovich v. Hicks*, 922 F.2d 1018, 1024 (2d Cir.1991), the Second Circuit affirmed a district court's refusal to grant a plaintiff an adverse inference instruction, noting that absent "any evidence of bad faith," plaintiff was not entitled to such an instruction. Most recently, the Court in *Reilly* recognized this apparent conflict but attempted to reconcile *Kronisch* and *Berkovich* by stating that neither set forth an absolute rule and that a case-by-case approach should be followed. 181 F.3d at 267. The *Reilly* Court held that "a finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoilator with an adverse inference instruction." *Id.* at 268. In this case, regardless of which standard we follow, plaintiff has offered no evidence that

these documents were intentionally destroyed after he filed his charge of discrimination or that they were destroyed in bad faith or that gross negligence was involved. Thus, we decline to draw any adverse inference as a result of their destruction.

9. Plaintiff argues that, if the rankings are averaged, he was actually third, but defendants placed him last. Plaintiff overlooks the fact that three committee members obviously rated plaintiff fourth, which would have given him a total score of 17, and two committee members rated MD fourth, which would have also given her a score of 17. Therefore, whether the scores were totaled or averaged, the result is the same, plaintiff was tied for last.

er than specifically answering the question asked. Mr. Nappi also expressed concern about the degree of plaintiff's focus on his own curriculum, since he would have been expected to teach according to the school's pre-determined curriculum.

After this initial interview, plaintiff was not selected as one of the three most qualified candidates. However, in recognition of his service as a substitute teacher for the Cromwell Board of Education, the Committee unanimously decided to allow him to return for an additional interview in an effort to give him a chance to improve his performance. (Nappi Dep. at 234).

The next interview was conducted by the Cromwell High School Principal and Assistant Principal. Again, all of the candidates were asked the same questions during this interview, including several questions based on concepts drawn from the Connecticut Competency Instrument ("CCI").[10] The CCI is a measurement tool developed by the Connecticut State Department of Education in 1992 for the purpose of assessing teaching competencies in the core areas of management, instruction, and the assessment of student progress. At this interview, plaintiff indicated that he was not familiar with the CCI. Significantly, however, neither Ms. Mancarella nor most of the other candidates were particularly familiar with the

CCI.[11] In the judgment of the Principal and Assistant Principal, plaintiff's responses to questions posed to him during the interviews did not demonstrate that he was the most qualified candidate and his responses did not demonstrate his familiarity with the basic competencies necessary for effective teaching. Principal Nappi gave as an example plaintiff's answer to the question of what he would do to re-engage a student who appeared to be continually off-task. Plaintiff cited two extreme examples,[12] involving disciplinary problems, where he called the administrative office for assistance. Plaintiff also referred once again to his 15-unit program, which he described as designed for a heterogeneous class, and stated that keeping students on task had presented no special problem. (Byrnie June Dep. at 89–90). Principal Nappi explained that the question was intended to elicit a response regarding how the teacher would get the student more involved or re-engaged. When asked how he would determine whether the lesson was being understood by the students, plaintiff responded that he would ask them if they understood what was going on. Principal Nappi gave other examples, but in sum, he characterized plaintiff's answers as non-responsive, general, vague, and unimaginative. On the other hand, in his opinion, Ms. Mancarella

10. The following questions based on the CCI were asked of the applicants:
How familiar are you with the Connecticut Competency Instrument?
If a student was persistently off task, what steps would you take to re-engage her/him?
Describe a lesson, explain your objective, outline strategies you would use to accomplish your objective.
In the lesson you discussed, how would you check for student comprehension?
If students were not understanding, what would you do?

11. Principal Nappi testified that he believed "most of them [the interviewees] if not all of them said that they were really not that familiar with it ... they weren't really familiar with the entire instrument or documentation." (Nappi Dep. at 241–42); *see also* (*Id.* at 76).

12. The first involved a student who appeared to be under the influence of drugs or alcohol. Instead of completing the assigned task, the student attempted to operate an oxyacetylene torch used for metal sculpting. Because of the potential for a serious accident, plaintiff stated that he discreetly phoned the office and asked for immediate assistance. The second incident involved two emotionally disturbed students engaged in a dispute over a mutilated doll in one of the student's backpacks. The doll was intended to represent the other student. Because of the psychological history of each student, plaintiff stated that he sought administrative assistance and both students were supposedly returned to a private facility. (Byrnie June Dep. at 90).

displayed enthusiasm, creativity, and an ability to work with a variety of different students, including those with special needs. She also demonstrated knowledge of the basic concepts of effective teaching strategies embodied in the CCI. Mr. Nappi testified that, although plaintiff had more years of teaching experience and had a master's degree, Ms. Mancarella was cho-sen over plaintiff because she demonstrated in her responses to the committee that she was the best candidate in the applicant pool. (Nappi Dep. at 219, 234); (Cassulla Dep. at 40, 110, 117).

The final step in the hiring process was for Ms. Mancarella, the top-ranking candidate, to interview with the School Superintendent, James Gere (male, age 58). The School Superintendent recommended the appointment of Ms. Mancarella to the Board of Education. The Board approved this recommendation in August, 1995. Plaintiff was invited to continue substitute teaching at the Cromwell High School during the 1995–96 school year but chose not to do so.

### DISCUSSION

### I. Plaintiff's Disparate Treatment Claim

■ Plaintiff's first claim is one of disparate treatment—that defendants did not select him for the art teacher position because of his age and gender. Because disparate treatment is a form of intentional discrimination, plaintiff must prove that defendants acted with discriminatory intent or motive. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). The basic allocation of burdens for a disparate treatment claim, whether based upon age or gender, is set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir.1999) (holding that the evidentiary framework for proving age discrimination is the same as that for proving discrimination under Title VII), *pet. for*

*cert. filed*, —— U.S. ——, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999); *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 316 (2d Cir.1999) (same).

■ In this case, contrary to the position advocated by defendants, plaintiff has clearly met his *de minimis* burden of establishing a prima facie case of discrimination. *See Fisher v. Vassar College*, 114 F.3d 1332, 1335 & 1340 n. 7 (2d Cir.1997) (*en banc*), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Plaintiff, a male, at the age of 64, was a member of a protected group. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that Title VII's prohibition of discrimination "because of sex" protects men as well as women). He was qualified for the position for which he applied. A substantially younger female applicant was selected over plaintiff, despite the fact that he had more teaching experience and a more advanced educational degree than the applicant selected and had six years of substitute teaching experience at Cromwell High School. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (holding that a plaintiff does not have to show that his replacement was not within the protected class, *i.e.* over 40, to establish a prima facie case of age discrimination. The fact that the plaintiff's replacement was substantially younger than the plaintiff was a more valuable indicator of age discrimination).

■ Likewise, there is no question that defendants have articulated a legitimate, non-discriminatory reason for not hiring plaintiff—*i.e.*, that they found another candidate to be better qualified based upon subjective selection criteria. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "At [this] point, the *McDonnell Douglas* framework—with its pre-

sumptions and burdens—is no longer relevant." *Fisher,* 114 F.3d at 1336 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (internal quotations omitted). "The defendant's 'production' ... having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [him].' " *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

At this stage in the proceedings, it is not the function of the Court to weigh the evidence or speculate as to how a jury might decide this case. Rather, in ruling on a motion for summary judgment, it is our job to decide only whether, based upon the facts that have been presented and the controlling law, there is a genuine issue of material fact that should go to a jury. *See* Fed.R.Civ.P. 56(c). In making this determination, we look to the law governing plaintiff's claims to determine what facts are material; we resolve all factual disputes in favor of the plaintiff, as the nonmoving party; and we draw all reasonable inferences in plaintiff's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Therefore, in ruling on defendants' motion for summary judgment, the issue before this Court is not whether plaintiff will ultimately prevail before a trier of fact but, rather, whether there is evidence in the record from which a rational jury could find that defendants' proffered legitimate reason was merely a pretext for impermissible discrimination. *See Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir.1998); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 38. Summary judgment may not be granted simply because the Court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. *Danzer,* 151 F.3d at 54

(citations omitted). "There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Id.* (citations omitted).

■ We have meticulously reviewed the voluminous papers and evidence submitted in support of and in opposition to the motion for summary judgment. In so doing, we have heeded the Second Circuit's repeated warning that a "trial court must be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast,* 191 F.3d 129, 134 (2d Cir.1999) (citing *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996), and *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994)). Nevertheless, after a careful review of all of the evidence submitted by plaintiff and, after drawing all reasonable inferences in his favor, we find no evidence that would support a jury's finding that defendants' proffered reason for not hiring plaintiff was a pretext for unlawful discrimination.

Plaintiff bases his pretext argument on the following claims: Plaintiff asserts that this was the fourth time he had applied for a teaching position with the Cromwell public schools between 1986 and 1995, and the fourth time he had been rejected. He charges defendants with treating him differently than significantly younger, female applicants at every stage of the selection process, despite what he claims were his superior qualifications. Plaintiff also claims that defendants' failure to follow meticulously its own hiring guidelines discriminated against him. He further claims that use of the CCI was a pretext for Cromwell's entirely subjective teacher selection process, which was used to mask intentional age and sex discrimination. Finally, he compares the gender composition

of defendants' teachers with the statewide teaching population and argues that the statistically significant differences show that defendants discriminate against male applicants and applicants over the age of 50. (Pl.'s Supp.Mem. at 33).

## A. Comparative Qualifications

We begin by addressing what we consider to be plaintiff's strongest argument in support of his claim of pretext—i.e. that his nonselection in the face of his superior qualifications supports a reasonable inference that his age and/or gender was the real reason for his not being hired.

In this case, there is no question that both plaintiff and Ms. Mancarella, the person ultimately selected for the art teacher position, more than met the minimum required qualifications. Both had significant teaching experience; both had been certified by the State of Connecticut to teach art at the high school level; both had B.A. degrees, plaintiff in Art Education, Ms. Mancarella in Fine Arts. Additionally, both had excellent letters of recommendation. However, it must be conceded that were the candidates to be judged on objective "paper" credentials alone, on which plaintiff so heavily relies, plaintiff would have the "edge." He had 21½ years of teaching experience in another school system as compared to her 7 years of teaching experience at a middle school and 6 years at the Children's Home. His experience was at the high school level; her experience was at the middle school level. He had a master's degree; she had taken a significant number of post-graduate courses but had not obtained her master's degree. Plaintiff had a "track record" at the High School. He had substituted for six years at the very school for which he was applying and had done a good job. He was frequently asked to take longer substitute teaching assignments and for three years had been paid a yearly stipend to serve as the faculty advisor to the literary magazine. She did not have this experience.

Plaintiff has attempted to prove intentional discrimination by comparing his "objective" qualifications with those of Ms. Mancarella. In Sanchez v. Philip Morris Inc., 992 F.2d 244, 247 (10th Cir.1993), the Court stated that it was "conceivable" that a discrimination plaintiff could be so "overwhelmingly better qualified" than another applicant that on that evidence alone a trial court could properly find pretext and intent to discriminate. However, in that case, even where the successful applicant "was not nearly as well qualified," the Court held that the difference in qualifications was not enough to support a finding of discrimination. Id. at 247–48. Generally pretext cannot be shown simply by identifying differences between plaintiff's qualifications and those of the successful applicant. Although evidence indicating that an employer misjudged an employee's qualifications is relevant to the question of whether its stated reason is a pretext masking prohibited discrimination, the disparity in qualifications must be overwhelming to be evidence of pretext. See Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C.Cir. 1996) (only when the employer makes "an error too obvious to be unintentional" should the court consider whether it had an unlawful motive for doing so, and cautioning against the use of ²⁰⁄₂₀ hindsight); Odom v. Frank, 3 F.3d 839, 847 (5th Cir. 1993) (holding that the evidence must show that the protected candidate was clearly better qualified to support a finding of pretext in the defendants' selection of the unprotected applicant). As the Fifth Circuit discussed in Odom v. Frank,

> We . . . remain cognizant of the fact that the evaluation of applicants (and applications) for high level positions in any discipline—business, industry, government, military, or education—involves both objective and subjective elements. We also recognize that subjectivity has a potentiality for abuse by those evaluators who would use it to shield the improprieties in the selection process, possibly even as a pretext for discrimi-

nation. On the other hand, as a general rule judges are not as well suited by training or experience to evaluate qualifications for high level promotion in other disciplines as are those persons who have trained and worked for years in the field of endeavor for which the applicants under consideration are being evaluated.

Therefore, unless disparities in curricula vitae are so apparent as virtually to jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty of experience by virtue of their own years of experience and expertise in the field in question.

3 F.3d at 847. Although we must concede that plaintiff had better objective "paper" credentials, we cannot say that, based upon these factors alone, he was overwhelmingly better qualified for the art teacher position.

Moreover, there is nothing in Title VII or the ADEA that required defendants to base their hiring decision solely upon objective "paper" credentials and overlook subjective factors gleaned from the applications and interviews. *See Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir.1980) (holding that when a promotional decision is reasonably attributable to an honest, even though partially subjective, evaluation of qualifications, no inference of discrimination can be drawn). Defendants were not required to hire the person with the greatest number of years of experience or the person with the highest level of education. Moreover, there is nothing in Title VII or the ADEA that would have required defendants to hire an older applicant over a younger applicant or hire a person because of his or her gender. *Wado v. Xerox Corp.,* 991 F.Supp. 174, 203 (W.D.N.Y. 1998) (losing out to younger candidate without more is insufficient to show pretext). There is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview. *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1317–18 (10th Cir.1999) (upholding the grant of summary judgment in favor of the employer, who based its hiring decision on the plaintiff's poor performance during an interview, despite plaintiff's dispute regarding her performance during the interview); *Nagel v. Avon Bd. of Educ.,* 575 F.Supp. 105, 110 (D.Conn. 1983) (holding that the use of subjective criteria by a selection committee did not preclude a finding that its promotion decision was made on other than discriminatory bases). The courts have recognized that the process of "[s]electing a pool of qualified candidates based upon their written credentials and then making a final selection based upon personal interviews is an obviously reasonable method of hiring a professional employee." *Fischbach,* 86 F.3d at 1183–84. An applicant's poor performance during an interview is a legitimate, nondiscriminatory reason for not hiring him. *See Wechsler v. R D Management Corp.,* 861 F.Supp. 1153, 1160 (E.D.N.Y.1994). Indeed, subjective evaluations of applicants for teaching positions would seem to be particularly important given the nature of the job for which they were being hired.

In this case, defendants do not deny that plaintiff was qualified for the position nor do they deny that he had been a good substitute teacher. They point to the fact that plaintiff successfully advanced through the first three rounds of the hiring process. (Although a trier of fact might well consider this factor as weighing against a finding of intentional discrimination, this fact could also be interpreted as defendants' being solicitous of an older applicant or of someone they had known for some time, or as defendants' attempting to cover up discrimination). But, defendants say that plaintiff did not interview well, that his answers were vague, unresponsive, and rambling, and that plaintiff did not demonstrate during the interviews that his management and in-

structional skills were consistent with concepts embodied in the CCI.

Substantial evidence has been presented concerning the interviews. The Committee's composition was well-balanced in terms of age and gender. The same questions were asked of all of the candidates during both interview sessions. Plaintiff has recounted his answers to many of the questions in his deposition testimony. However, four years have passed since the candidates were interviewed, and no one deposed remembers precisely how the other candidates answered the questions or whether plaintiff's recollection of his answers is accurate. What they do remember is that Ms. Mancarella made a very good impression and that her answers generally showed she possessed the requisite teaching competencies, whereas plaintiff's answers did not. Moreover, even if we were to have an exact transcript of the interviews—and we certainly do not mean to suggest that there should have been such a transcript—it is not the function of this Court to second-guess a hiring decision made by defendants. *See Simms v. Oklahoma,* 165 F.3d 1321, 1330 (10th Cir. 1999) (holding that district courts, when analyzing the pretext issue, do not sit as "super-personnel departments," free to second-guess the business judgments of an employer), *cert. denied,* —— S.Ct. ——, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999) (No. 98–1884). Title VII and the ADEA are not violated just because an employer made an erroneous, poor, or illogical business decision. *See Sanchez v. Philip Morris, Inc.,* 992 F.2d at 247. We may agree or disagree with their decision, but that does not mean there was a violation of Title VII or the ADEA.

In an effort to show that defendants' proffered reason was a pretext for discrimination, plaintiff has offered his own testimony by affidavit and through depositions in which he makes many self-serving statements regarding his qualifications and his performance during the interviews. A review of the record shows that the vast majority of the "factual disputes" alleged by plaintiff are in reality his opinion that the Committee members were wrong or biased in their assessment of his qualifications. These statements fall short of establishing a dispute about the genuineness of the Selection Committee's assessment of his qualifications. *See Bullington,* 186 F.3d at 1317 & n. 13 (holding that plaintiff's own opinion about her qualifications and the fairness of the interviewers' assessments of her was not evidence of pretext).

Plaintiff has also provided affidavits of other persons in the field concerning his qualifications, letters of commendation, performance reviews, and letters of reference, all attesting to his teaching abilities and qualifications for the position. While these are relevant to show that plaintiff was well-qualified for the position, that issue is not disputed.

However, even if we were to assume that the Selection Committee misjudged plaintiff's qualifications, this would not preclude summary judgment in this case, for the relevant inquiry in a disparate treatment case is not whether defendants' proffered reasons were wise, or fair, or correct, but whether defendants honestly believed those reasons and acted in good faith upon those beliefs. *Bullington,* 186 F.3d at 1318. As the Court stated in *Hollander v. American Cyanamid,* "[w]e need not decide whether [plaintiff] offered enough evidence to establish that [defendants] used his allegedly poor [performance during the interviews] as a pretext for its true reasons for [not hiring him]. Assuming arguendo that he did, this is far from the end of the matter, for to survive summary judgment [plaintiff] had to show not only pretext, but also *either use of a pretext that itself implies a discriminatory stereotype, or use of a pretext to hide age discrimination.* This he did not do." 172 F.3d at 200 (emphasis in original).

In *Hollander,* the Second Circuit reviewed its earlier *en banc* decision in *Fisher,* which presented a "similar situation."

*Id.* In *Fisher*, the plaintiff had offered evidence that contradicted certain conclusions concerning her performance by the tenure review board. The Second Circuit panel, which was affirmed by the Court *en banc*, reversed the district court's finding that plaintiff had been unlawfully discriminated against on the basis of her gender. The Court held that plaintiff's evidence did not show that the defendant's stated reason for denial of tenure was a pretext for discrimination on the basis of her sex or that the reason itself reflected a discriminatory stereotype. *Fisher*, 114 F.3d at 1339. The *en banc* majority opinion in *Fisher* stated that a "plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext *for discrimination,* either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both. And, the Supreme Court tells us that 'a reason cannot be proved to be a "pretext *for discrimination* " unless it is shown *both* that the reason was false, and that discrimination was the real reason.' " *Id.* (quoting *St. Mary's*, 509 U.S. at 515, 113 S.Ct. 2742) (emphasis in original).

In this case, plaintiff has produced no evidence indicating that defendants did not honestly believe the reasons they offered for not selecting plaintiff. Moreover, even assuming that plaintiff's allegedly poor interviews were used by defendants as a pretext for their true reason for not hiring him, the pretext in and of itself does not suggest age or gender discrimination. *See Hollander*, 172 F.3d at 201; *Fisher*, 114 F.3d at 1339. Further, nothing else in the record points to age or gender discrimination as the real reason for not hiring plaintiff. Plaintiff has put forth no evidence of age- or gender-related remarks or any actions toward him by any of individual involved in the selection process that would suggest age or gender discrimination, and admits that nothing was said to him during the interview process that had anything to do with his age or gender. (Byrnie June Dep. at 61–62, 124–25). He testified that

there was nothing overt that led him to believe that there was age bias in the interview process. (*Id.* at 62). "There was nothing in their questions that would indicate any bias." (*Id.* at 63). Plaintiff's "mere conjecture that [defendants'] explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

Thus, we hold that this is not a case in which the finder of fact could reasonably conclude, based upon the candidates' relative qualifications, that the failure to hire plaintiff was more likely than not due to age or gender discrimination because no other non-discriminatory explanation was possible. *See Hollander*, 172 F.3d at 202; *Fischbach*, 86 F.3d at 1184 (holding that the plaintiff was obliged to prove that the defendant had preferred another candidate not upon the basis of his answers at the interview, but because of his race, a burden which the plaintiff did not carry).

## B. The Selection Process

■ Plaintiff has also challenged the entire selection process, as well as each step of the process, as discriminatory.

Plaintiff claims that the Screening Committee allowed the applications of substantially younger female candidates, including the application of Ms. Mancarella, to remain in the process even though they were incomplete and the candidates were unqualified. Specifically, he complains that Ms. Mancarella's application should have been eliminated because it lacked portions of transcripts from certain undergraduate institutions she attended before Wesleyan, where she received her degree. We concur with defendants that, with respect to this issue, plaintiff is focusing on "irrelevant minutiae." First, the testimony of those who reviewed the applications indicates that they were not aware that any transcripts were missing from her application and that the applications were re-

viewed only for general, overall completeness. *See. e.g.,* (Nappi Dep. at 113). Thus, it is difficult to fathom how one could reasonably conclude that, by leaving in Ms. Mancarella's allegedly incomplete application, the Committee intended to discriminate against plaintiff. Plaintiff also complains that, although the Board's written Recommended Hiring Procedures required the Committee of three to prescreen these applications together, they reviewed them separately.[13] While irregularities in the hiring process may give rise to an inference of discrimination in certain circumstances, *see, e.g., Zahorik v. Cornell Univ.,* 729 F.2d 85, 94 (2d Cir.1984), there is nothing in the record of the instant case from which an inference of discrimination could be drawn by this alleged deviation from the Board's procedures. *See Fischbach,* 86 F.3d at 1183. Logically, it would seem that reviewing the applications independently might lessen the chances of discrimination. However, the most significant fact weighing against plaintiff's claim that this aspect of the selection process discriminated against him on the basis of his age or gender is that plaintiff's application remained in the process and, thus, it was in no way prejudicial to him.

Plaintiff complains that the next step in the selection process, in which the Selection Committee reviewed and ranked the applications, was discriminatory. Plaintiff complains that his application was ranked lower than the applications submitted by many of the substantially younger female candidates, despite what he claims were his superior "paper" qualifications. Plaintiff compares his years of teaching experience, his academic degrees, and the number of state certifications he held with those of Ms. Mancarella. Plaintiff claims that one could reasonably infer that the Committee adopted a subjective process for ranking candidates so that it could discriminate against plaintiff. We do not

agree that such an inference can *reasonably* be drawn.

As discussed above, the Committee was not limited to considering these three objective "paper" criteria in ranking the applications. Contrary to plaintiff's assertion that there could be no other explanation for these rankings, other than gender or age discrimination, factors such as a Committee member's subjective impression of the overall application package, personal knowledge of the applicant or of someone who provided a letter of reference, statements in the letters of reference, grades or course work from a particular educational institution, statements of teaching philosophy, or any one of a number of other factors could account for these differences. Moreover, despite plaintiff's complaints concerning the ranking he received, he was one of the five candidates selected to continue on for individual interviews, and, significantly, was selected ahead of 15 female candidates. Additionally, plaintiff has offered no evidence that the rankings at this stage played any role in the ultimate selection decision.

Plaintiff next challenges as discriminatory the "gerrymandered" rankings given by Committee members following the first round of interviews. Plaintiff complains that, during these interviews, the Selection Committee ranked plaintiff's performance differently than the substantially younger female candidates who were interviewed, although he does not specify in what respects he was rated differently. Plaintiff asserts that the young female candidates were given "numerous beneficial treatments" throughout the interview and ranking process, although he provides no evidence to support this broad categorical assertion. Plaintiff also claims that one of the questions posed of the applicants, "Why do you want to be a teacher?," showed that defendants preferred younger

---

**13.** We do not read the Recommended Hiring Procedures as mandating that the Screening Committee review the applications together. Paragraph 3 simply states that the Committee

will meet to "pre-screen all applications to arrive at a working number of applications for further consideration."

employees, since this question was clearly drafted for an applicant pool of beginning teachers. We agree with plaintiff that this question was not artfully drafted particularly for interviewing experienced teachers. We disagree that one can infer age discrimination from this question, especially since all applicants were required to have prior teaching experience.

Plaintiff also states that his answers to the questions were equal to or superior to those of substantially younger female candidates. As noted above, we give little weight to plaintiff's subjective opinion of his own performance and qualifications vis-a-vis the other candidates. *See Viola v. Philips Med. Sys. of North America,* 42 F.3d 712, 718 (2d Cir.1994); *Shapolia v. Los Alamos Nat'l Laboratory,* 992 F.2d 1033, 1039 (10th Cir.1993). Moreover, even putting aside his own personal bias, it is difficult to understand how plaintiff could assess his performance compared to that of the other candidates when he was not present during their interviews.

Plaintiff next challenges the second set of one-on-one interviews, claiming again that younger female applicants were given "numerous beneficial treatments." Once again, he offers no evidence to support this claim. He also challenges the evaluation of his interview in comparison to that of the younger, female applicants. As noted above, we give little credence to plaintiff's own evaluation of his performance in comparison to others' interviews, of which he could not possibly have first-hand knowledge.

Plaintiff further claims that defendants' reliance on the CCI, which was developed after he had obtained his teaching certificate, discriminated against him because of his age. Plaintiff maintains that this was the deciding factor in his not being selected. Ms. Mancarella had likewise obtained

her teaching certificate long before the CCI was implemented and she, too, was not familiar with it. This alone would seem to indicate that familiarity with the CCI was not a critical factor in the selection process. Moreover, the fact that defendants used a hiring process developed after plaintiff obtained his teaching certificate does not establish intentional discrimination.[14] *See. Wado,* 991 F.Supp. at 194 (holding that defendant's preference for employees proficient in the use of computers did not give rise to an age discrimination claim). Additionally, other than the one question that directly asked about the interviewee's familiarity with the CCI, the rest of the questions did not even refer to the CCI and asked only about general management and instructional concepts and philosophies. According to defendants, it was plaintiff's failure to demonstrate a teaching philosophy consistent with principles and basic competencies embodied in the CCI that was the basis for their decision. *See* (Cassella Dep. at 39). Indeed, plaintiff, who has since become familiar with the CCI, admitted in his deposition that the CCI embodies concepts that teachers have been using for years.

> Does the CCI have anything to do with art education, sure it does. The CCI simply reflects what good teachers have been doing for years. There is nothing new in the CCI. All they have tried to do is come up with a standard measuring procedure that evaluators can perform so it has meaning from one community to another wherever a teacher may move.

(Byrnie Aug. Dep. at 266); *see also (Id.* at 299).[15]

Based upon the evidence of record, we decline to infer age discrimination from plaintiff's single question about the CCI,

---

14. *See* discussion at 37–44, *infra,* regarding plaintiff's claim that use of the CCI had a disparate impact.

15. In response to the question, "How could someone in '74 have knowledge of the CCI?,"

Superintendent Gere likewise testified: "Because the components that make up the CCI are very basic and very generic to good teaching and they've existed from time immemorial." (Gere Dep. at 55).

particularly since the successful candidate was also unfamiliar with it. The remaining questions, by plaintiff's own admission, embodied basic teaching philosophies, and while they may have been taken from the CCI, this does not suggest any discriminatory purpose.

Finally, plaintiff claims that the final interview with the superintendent was discriminatory because he only had one candidate from which to make his decision. We fail to comprehend how this could possibly suggest unlawful discrimination. At some point in every hiring decision, the field of applicants is narrowed to a single candidate.

Accordingly, we find no evidence to support plaintiff's claim that he was "consistently treated differently than ... the substantially younger female candidates" in the selection process and that this different treatment supports an inference of age discrimination.

### C. Statistical Evidence

■ Plaintiff has also provided statistical evidence, showing that Cromwell had a significantly lower percentage of male teachers than the statewide population of male teachers. For example, plaintiff cites to the fact that in 1995 Cromwell had only 16.9% full-time male teachers, whereas statewide there were 26.9% male teachers. Plaintiff also compares the number of male teachers hired (12) in Cromwell over an eleven-year period to the number that he claims should have been hired (34) based upon the average number of male teachers in the statewide teacher population during those eleven years. According to plaintiff, "[t]he statistics tell the story. Cromwell maintained a pattern and practice of discriminating against male teachers; Mr. Byrnie was a victum [sic] 1995, 1994, 1992, and in 1986." (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ.J. at 46).

This statistical evidence, without more, does not tell the story. *See Odom,* 3 F.3d at 849; *Hollander,* 172 F.3d at 202–03; *Sweeney v. Research Foundation of New York,* 711 F.2d 1179, 1187 (2d Cir.1983) (holding that statistical evidence alone does not necessarily imply unlawful discrimination). Although the Second Circuit has recognized that disparate treatment plaintiffs may introduce statistics as circumstantial evidence of discrimination, that evidence must be relevant to the question of discrimination against this particular plaintiff. *Hollander,* 172 F.3d at 202; *Stratton v. Department for the Aging,* 132 F.3d 869, 877 (2d Cir.1997). Plaintiff's reliance on raw statistical data, in the absence of any effort to account for other causes of the under-representation of male teachers in Cromwell, does not support an inference of age discrimination. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (requiring a showing of causation between the challenged employment practice and the alleged disparities); *Raskin v. Wyatt Co.,* 125 F.3d 55, 67–68 (2d Cir.1997). In an individual disparate treatment case, the focus must be on how and why the employer treated a particular individual the way that it did. Thus, statistical evidence generally has little bearing on the specific intentions of the employer in making a particular hiring decision and will rarely suffice to rebut an employer's legitimate, nondiscriminatory reasons for a particular adverse employment action. *See LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 848 (1st Cir. 1993) (holding that the focus in disparate treatment cases is on how a particular individual was treated and, thus, although statistical evidence of hiring patterns is relevant, it carries less probative weight than in a disparate impact case), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). In this case, we find that plaintiff's raw statistical data does not support a finding that defendants' articulated non-discriminatory reason for not selecting plaintiff was pretextual.

### D. Conclusion—Disparate Treatment

Although it is beyond dispute that plaintiff was clearly qualified for the teaching

position and, indeed, possessed superior objective paper credentials than the person selected, we find that there was not such a gross disparity in qualifications as to raise an inference that defendants' non-discriminatory reason was a pretext for unlawful discrimination. Defendants found Ms. Mancarella better qualified after two rounds of interviews and, although their hiring decision was based upon their subjective evaluations of her performance during the interviews, there is nothing in the record to indicate that they did not genuinely believe her to be the better qualified candidate. Plaintiff's challenges to each step in the selection process similarly do not suggest that age or gender was a motivating factor in defendants' decision. Likewise, plaintiff's reliance on raw statistical data showing an under-representation of males among defendants' teaching staff does not rebut the nondiscriminatory reason offered by defendants for not selecting plaintiff. Neither plaintiff's membership in a protected class, nor his suspicions of discriminatory motive, can sustain his burden of proof in the face of defendants' credible evidence of a non-discriminatory reason for his nonselection. *See Nagel,* 575 F.Supp. at 111; *Brennan v. Metropolitan Opera Ass'n, supra,* 1999 WL 731762 (affirming the grant of summary judgment on plaintiff's age discrimination claim where there was no evidence in the record that the defendant had considered plaintiff's age in making its employment decision); *Hollander,* 172 F.3d at 204 (affirming the grant of summary judgment where plaintiff's statistical and non-statistical evidence was insufficient to create an inference of age discrimination); *Bullington,* 186 F.3d at 1317 (affirming the grant of summary judgment where the defendant based its nonselection decision on plaintiff's poor performance during an interview despite plaintiff's disputes over what was said in the interview, the interviewer's alleged use of gender and age stereotypes, the comparison of her qualifications to those of the successful candidates, and statistical evidence).

Accordingly, after a careful review of the record, we grant defendants' motion for summary judgment on plaintiff's disparate treatment claim.

## II. Plaintiff's Disparate Impact Claims

Plaintiff also claims that the procedures defendants followed to recruit and/or hire certified teachers had a disparate impact on male job applicants and on job applicants over the age of 50 based upon the fact that for the past ten years, including 1995, the year in which plaintiff was not hired, defendants have consistently hired female teachers at a rate far in excess of the rate at which they hired male teachers, and have consistently hired teachers who are under age 50 at a rate far in excess of the rate at which teachers over the age of 50 have been hired. Additionally, plaintiff challenges defendants' use of the CCI as having an adverse impact on older job applicants who would not be familiar with the CCI. Thus, plaintiff has asserted essentially two different disparate impact claims, although one is somewhat subsumed within the other.

▮▮▮ A disparate impact claim differs from a disparate treatment claim in that it does not require a showing of discriminatory intent. *Bullington,* 186 F.3d at 1312. A disparate impact claim involves employment practices that are "fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). To establish a prima facie case of disparate impact, a plaintiff must point to a specific employment practice and then show that the challenged, facially-neutral employment policy or practice has a significant disparate impact on a protected group. *Id.* at 430–32, 91 S.Ct. 849; *EEOC v. Joint Apprenticeship Comm. of the Joint Ind. Bd. of the Elec.,* 186 F.3d 110, 117 (2d Cir.1999). Once the plaintiff demonstrates that the particular employment practice causes a disparate impact, the defendant must demonstrate that the challenged

practice is job-related for the position in question and consistent with business necessity. 42 U.S.C. § 2000e–2(k)(1)(A)(i).[16]

### A. Exhaustion of Administrative Remedies

■ Initially defendants challenge plaintiff's disparate impact claim on the ground that plaintiff did not raise this claim in his administrative filings and has failed to exhaust administrative remedies. We disagree. Plaintiff's discrimination charge referred to age and gender discrimination categorically. He did not limit his charge to either a disparate impact or disparate treatment theory. Plaintiff, who filed his charge *pro se*, was not required to specify under what theory of discrimination he was proceeding. The Second Circuit in *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir.1998), upheld the district court's jurisdiction over a disparate impact claim that had not been raised in the plaintiff's charge before the EEOC, finding that this claim was "reasonably related" to the EEOC charge. The Court stated that such claims are allowed "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (internal citations and quotations omitted). We find that plaintiff's disparate impact claim would fall within the scope of the investigation of his original charge. Thus, we disagree with defendants that plaintiff's disparate impact claim is barred based upon a failure to raise this claim in his administrative charge.

### B. The Overall Selection Process

■ In this case, plaintiff challenges the overall recruitment and selection process as having an adverse impact on men and applicants over 50. Plaintiff cites to the Connecticut statewide teacher demographic data, which shows that, in 1995, 73.1% of the teachers were female, and 26.9% were male. Cromwell had 83.1% female teachers and 16.9% male. Plaintiff does not provide similar statistics with regard to the age of the teachers hired compared to the state teaching pool but simply alleges that, in 1995, defendants hired teachers who are under the age of 50 at a rate far in excess of the rate that they hired teachers over the age of 50 even though the population of available qualified teachers over the age of 50 far exceeds their rate of hire.

The Supreme Court recognized in *Watson v. Fort Worth Bank & Trust*, 487 U.S. at 991, 108 S.Ct. 2777, that subjective hiring practices can form the basis of a disparate impact claim. *See also Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1370 (2d Cir.1989), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). However, the Supreme Court has also instructed that a plaintiff's burden goes beyond the need of identifying statistical disparities in the employer's work force. "The plaintiff must begin by identifying the specific employment practice that is challenged ...," especially in cases where an employer combines subjective

---

**16.** Title VII provides as follows:

An unlawful employment practice based on disparate impact is established under this subchapter only if—

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of ... sex ... and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity....

42 U.S.C. § 2000e–2(k)(1)(A)(i). Although the ADEA does not contain a similar provision and the Supreme Court has never decided whether a disparate impact theory of liability is available under the ADEA, *see Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the Second Circuit has held that a violation of the ADEA may be demonstrated by showing disparate impact. *See Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir.), *cert. denied*, 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997); *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1372–73 (2d Cir. 1989), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990).

criteria with the objective factors. *Wards Cove Packing*, 490 U.S. at 656, 109 S.Ct. 2115. "Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994, 108 S.Ct. 2777.

Initially, with respect to plaintiff's claim that the selection process had an adverse impact on men and older applicants, we question whether plaintiff has sufficiently identified a specific employment practice that he is challenging.[17] *See Wards Cove Packing*, 490 U.S. at 656, 109 S.Ct. 2115; *Lowe*, 886 F.2d at 1370–71 (holding that plaintiffs could not satisfy the requirements of a prima facie case simply by broadly attacking as discriminatory the hiring process as a whole).

Moreover, both the Supreme Court and the Second Circuit have repeatedly held that allegations of a bottom-line imbalance in the work force are insufficient to make out a prima facie case of discrimination based upon a theory of disparate impact. *See Wards Cove Packing*, 490 U.S. at 652, 656, 109 S.Ct. 2115; *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 159 (2d Cir. 1991). The Second Circuit in *Lopez* and *Brown* emphasized that a plaintiff must point to more than mere under-representation of a particular protected group, since this under-representation might result from a number of factors other than their protected status (in this case, age or gender). The burden is on plaintiff to show a causal connection between the specific factor challenged under the disparate impact model and the discriminatory impact. Thus, in *Brown*, the Court found insufficient plaintiff's allegations showing a drop in minorities employed by the defendant over a five-year period compared to the percentage of minorities employed in New York City (where the defendant was located) in the trade in question.

Because the plaintiff failed to connect the general statistics to any of defendant, the Court held that plaintiff had failed to establish a prima facie case of disparate impact. *Brown*, 163 F.3d at 712–13. And, in *Lopez*, the Court rejected the plaintiff's disparate impact claim where he failed to show that the employer's challenged practices bore any causal relationship to the dearth of black employees in the defendant's regional offices. *Lopez*, 930 F.2d at 160. *See also Wards Cove Packing*, 490 U.S. at 651–52, 109 S.Ct. 2115 (in which the Supreme Court held that plaintiff's statistics showing a high percentage of minorities in low-level cannery jobs were insufficient to establish a prima facie case of disparate impact).

In this case, plaintiff attempts to compare defendant's percentage of male teachers to the statewide male teaching population and, although he alleges under-representation of teachers over age 50, he provides no specific data to support this claim. This raw data is insufficient to support a finding that defendants' overall selection procedures had an adverse impact on men or applicants over age 50. In this case, only 3 of the original 41 applicants, or 7.3%, were male teachers, which is substantially smaller than the percentage of male teachers employed by defendants (16.9%). Whether the part-time nature of this position, or the subject matter of the teaching position, or the geographical location, or some other factor influenced this low number of male applicants is unknown. However, these other possible factors point out the unreliability of simply pointing to a bottom-line imbalance in the workforce compared to statewide statistics in support of a claim of disparate impact. Therefore, we find that plaintiff has failed to carry his prima facie burden

---

17. Plaintiff clearly has not identified a specific recruitment process that he is challenging. We have no information concerning defendants' recruitment practices other than the advertisement to which he responded for this particular job.

of showing disparate impact with respect to the overall selection process.

### C. Use of the CCI

██ Plaintiff also challenges on adverse impact grounds defendants' use of questions from the CCI. Plaintiff contends that because it was not adopted until 1992, it necessarily would have an adverse impact on teachers who had obtained their teaching certificates prior to that time. Furthermore, he claims that some of the terminology employed by the CCI would be unfamiliar to older, experienced teachers.

We have already addressed the question of whether defendants' questions based upon core teaching competencies taken from the CCI would support a finding of intentional discrimination and held that they would not. As to whether this would support a finding of disparate impact, plaintiff has failed to provide any statistical evidence whatsoever that use of the CCI had a causal relationship with the alleged disparate under-representation of older teachers. As we noted above, in this case, the applicant chosen was also not familiar with the CCI. Indeed, were we to agree with plaintiff that teachers who obtained their teaching certificates prior to 1992 would not be familiar with the CCI, defendants' use of the CCI in 1995 could potentially have adversely affected all teachers who held teaching certificates for more than three years, thus impacting many teachers not in a protected age group—teachers under the age of 30 and 40—as well as those over 40. However, plaintiff has provided us with no statistical data or other information from which we could conclude that there was in fact an adverse impact resulting from the CCI. Lastly, had plaintiff been able to meet his prima facie burden, we think it likely that defendants would be able to show the job-relatedness of the CCI, although that is an issue we specifically do not reach.

Therefore, on plaintiff's claim that defendants' use of the CCI in the selection process had an adverse impact on older applicants, we likewise grant summary judgment in favor of defendants.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [**Doc. # 18**] is GRANTED on all counts of plaintiff's amended complaint. The Clerk is directed to enter judgment accordingly and to close this file.

SO ORDERED.